1       IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF IOWA
2                 CEDAR RAPIDS DIVISION

3

4  J&M MANUFACTURING, CO, INC.,              )
                                            )
5          Plaintiff/Counter Defendant,     )
                                            )
6      VS.                                  )        22-CV-94
                                            )
7  KINZE MANUFACTURING, INC.,               )
                                            )
8          Defendant/Counter Claimant.      )

9                        *  *  *  *  *

10

11

12              **TUTORIAL FOR THE COURT AND**
         **HEARING ON DEFENDANT'S MOTION FOR**
                **JUDGMENT ON THE PLEADINGS,**
13       **HELD BEFORE THE HON. C.J. WILLIAMS,**

14

15  on the 10th day of April, 2023, at 111 Seventh Avenue

16  S.E., Cedar Rapids, Iowa, commencing at 8:56 a.m., and

17  reported by Patrice A. Murray, Certified Shorthand

18  Reporter, using machine shorthand.

19

20

21  Transcript Ordered:  5/31/23
    Transcript Completed:  6/23/23

22

23              Patrice A. Murray, CSR, RMR, FCRR
                       Court Reporter
24                     PO Box 10541
                  Cedar Rapids, Iowa 52410
25              PAMurrayReporting@gmail.com

1          **APPEARANCES:**

2     **FOR J&M MANUFACTURING:**

3     ATTORNEY SHAWN D. BLACKBURN, Susman Godfrey, LLP,
      1000 Louisiana, Suite 5100, Houston, Texas 77002.

4
      ATTORNEY GOPAL RAO GANNAMRAJ, 2620 Crawford Street,
5     Houston, Texas 77004.

6     ATTORNEY THOMAS D. WOLLE, Simmons Perrine Moyer Bergman,
      PLC, 115 Third Street S.E., Suite 1200, Cedar Rapids,
7     Iowa 52401.

8

9     **FOR KINZE MANUFACTURING:**

10    ATTORNEY GLENN L. JOHNSON, McKee, Voorhees & Sease, PLC,
      801 Grand Avenue, Suite 3200, Des Moines, Iowa 50309.
11
      ATTORNEY JONATHAN LEE KENNEDY, McKee, Voorhees & Sease,
12    PLC, 801 Grand Avenue, Suite 3200, Des Moines,
      Iowa 50309.
13
      ATTORNEY JAY D. GRIMES, in-house counsel for Kinze
14    Manufacturing, 2172 M Avenue, Williamsburg, Iowa 52361.

15

16

17

18

19

20

21

22

23

24

25

1     (The following proceedings were held in open court.)

2          THE COURT:  We are here in the matter of J&M

3  Manufacturing versus Kinze Manufacturing, case number

4  22-CV-94.  We're here today for a couple things.  One is

5  a tutorial for the Court.  The second is for a hearing on

6  a defendant's motion for judgment on the pleadings.

7      I'm going to have counsel go ahead and introduce

8  themselves to me so I can keep track of everybody.  So on

9  behalf of the plaintiff, who is appearing and who will be

10  covering what portion of the hearing, please?

11          MR. BLACKBURN:  Your Honor, Shawn Blackburn

12  from Susman Godfrey representing J&M Manufacturing.  This

13  is my co-counsel, Gopal Gannamraj.

14          MR. GANNAMRAJ:  Good morning.

15          THE COURT:  Good morning.

16          MR. BLACKBURN:  And this is local counsel from

17  here in town, Thomas Wolle.

18          THE COURT:  Mr. Wolle.  Thank you.

19          MR. BLACKBURN:  And I will be doing all the

20  arguing.

21          THE COURT:  You'll be doing everything,

22  Mr. Blackburn, very good, okay.  Thank you.

23      And for the defense?

24          MR. JOHNSON:  Good morning, Your Honor.  Glenn

25  Johnson for Kinze Manufacturing.  To my right is Lisa

Larbi-Siaw, my legal assistant.  She is the tech person

here helping out a very untech person to her left.

THE COURT:  Always good to have.

MR. JOHNSON:  It is good to have.  I agree.

Jonathan Kennedy, my partner.  He will be arguing

the motion.  I will be presenting the tutorial, Your

Honor.  And then on the far right is Jay Grimes, who is

in-house counsel for Kinze Manufacturing.

THE COURT:  Welcome.

All right.  I think it will be best for us to do the

tutorial first.  It only makes sense.  And then we'll go

from there to the hearing on the motion.  I don't care

what order we present the tutorial.  Have you talked

about the order here?

MR. BLACKBURN:  Yes, Your Honor.  I think we're

going to go first on the tutorial; and then, obviously,

since the motion is their motion, they'll go first on

that one.

THE COURT:  That makes sense.  So I'm ready to

be educated, so go ahead.

MR. BLACKBURN:  All right.  Your Honor, let

me -- Your Honor, if -- do you mind if I sit for this?

I've got to operate the --

THE COURT:  Whatever is easiest for you.

MR. BLACKBURN:  Perfect.  Thank you.  I was

1   locking for an HDMI at the table, but there's not one.

2       So the way we've done our technology tutorial, which

3   is how I've done it most in the past, is we've put

4   together about a five-minute video that explains it.  And

5   we have a voice actor who is way more eloquent than me

6   that will be talking, but I'm going to pause it at a

7   couple points and draw out a couple points that we view

8   as important.

9               THE COURT:  Very good.

10       Patrice, can you hear okay?

11              COURT REPORTER:  If he could get a little bit

12  closer.  I can hear you, but --

13              THE COURT:  Yeah, if you pull that microphone

14  just a little bit closer.

15              MR. BLACKBURN:  Okay.  How's that?  Is that

16  better?

17              COURT REPORTER:  Yes.  Thank you.

18              MR. BLACKBURN:  Okay, great.

19       I'll go ahead and start this.

20       (Whereupon, the video was played.)

21              MR. BLACKBURN:  I'm going to stop just really

22  quickly, and I want to kind of explain what you are

23  looking at here.  So this is a grain cart that is filling

24  up a truck with grain.  And this is -- this one just

25  depicts the commercial embodiment of what the patent

claims. And if you see this part that's hanging down like that, that is what we call the flow control spout. And in this one, it's an askewed flow control spout, and it kind of moves back and forth. And what it does is it allows you to have this grain fill the corners of these trucks, whereas in previous -- previous to this, what you had, you had a thing just kind of shooting straight in and then a gentleman would climb up and basically rake it over into the corners and then continue to fill up. And with this, you don't have to do that.

(Whereupon, the video was played.)

MR. BLACKBURN: So this is one of the pieces of prior art. And if you look at the auger conveyor and the spout there at the end, you'll see that it's just shooting straight into the truck. And it doesn't have a downward spout that can move kind of back and forth.

THE COURT: Can I -- let me ask you a question.

MR. BLACKBURN: Yes.

THE COURT: Can the operator adjust the direction of the spout --

MR. BLACKBURN: Yes, it's my --

THE COURT: -- remotely?

MR. BLACKBURN: It's my understanding that they can, yes.

THE COURT: So he can sit -- or he or she can

sit in the tractor and then adjust which direction that
spout is started --

        MR. BLACKBURN:  That's right, and he can view
it while he's in the tractor.  And so this is one piece
of prior art.  The next thing -- and, again, the next
kind of piece of prior art that was just prior to this
one with the askewed full control spout actually did have
a spout that was kind of like this, but it didn't have
all of this nice action.

        THE COURT:  Okay.

     (Whereupon, the video was played.)

        MR. BLACKBURN:  So as you can see, this is kind
of the next step in the evolution of these things.  And
this one has just this kind of fixed control spout.

     (Whereupon, the video was played.)

        MR. BLACKBURN:  So here's the inventive control
spout.  And as you can see, it's able to shoot the grain
into the corners, whereas the prior art was not able to
target that and do that.

     (Whereupon, the video was played.)

        MR. BLACKBURN:  And, Your Honor, that's -- so
that's our technology tutorial.  I'd be happy to answer
any questions if you have any for me.

        THE COURT:  I don't think I have any more at
this point.

1          MR. BLACKBURN:  Thank you, Your Honor.

2          THE COURT:  All right.

3          MR. JOHNSON:  Your Honor, if it's all right,

4    I'd like to use the lectern to chat with you.

5       And if you have any trouble hearing me, would you

6    let me know, please.  Okay?

7          COURT REPORTER:  Yes.

8          MR. JOHNSON:  Thank you very much.

9       Your Honor, our approach is somewhat different than

10   J&M's approach, and that is we thought it was important

11   to -- as part of the tutorial, to talk about the harvest

12   in general and -- so that the Court has a -- an

13   appreciation and understanding of how the grain cart fits

14   into the overall harvest scheme that's relevant to the

15   farmer and relevant to the public that eats the farmer's

16   products.

17      If Your Honor has been involved with the harvest

18   before, then please let me know so I can tailor back some

19   of the remarks; otherwise, I'm going to have probably a

20   little bit of detail here specific to the harvest.

21          THE COURT:  That's fine.  I'm the son of a

22   haberdasher, so I have no farming experience whatsoever.

23          MR. JOHNSON:  All right, sir.  Well, we'll see

24   if we can change that.

25       Given the fact we are in Iowa, we used corn as our

primary medium of discussion here today in terms of the

harvest. But clearly the grain wagons that are involved

in this litigation can be used for either small grains or

large grains, not confined to corn, just to make sure

that we're crystal clear on that point.

Lisa, could you put up slide 2, please? Oh, you

already have it up. Never mind.

She's ahead of me again, Your Honor.

So basically, Your Honor, what we've got here on

slide 2 is we show the -- on the upper left picture, the

combine that is offloading into the Kinze 1421 grain

wagon. And then the grain wagon in the lower right is

transported to the -- the semitruck where it's unloaded

into the trailer.

Now, first of all, in the upper left-hand corner,

talking about the combine, the combines are used to pick

grains, not just corn. They have different front ends

that are called heads. So with regard to corn, there's

what's called a corn head. It has what are called row

units. And what that is, is if -- as corn is planted,

it's planted at various widths. It can be 15-width [sic]

narrow-row corn or 30-row -- or 30-inch width -- excuse

me, 15-inch or 30-inch, which is kind of your standard.

And an interesting Iowa tidbit, if you will, is that the

30-inch row spacing for corn developed historically

1  because that was roughly the width of a horse going down

2  between the rows of corn.

3      So we have, essentially, the rows of corn.  We have

4  the row units for the corn head that pick those corn

5  plants.  They actually grab them, they pull them down,

6  and they essentially pop the ear off.  The ear goes back

7  into the combine.  Inside of the combine, there is what's

8  called a rotary chamber, and it has a large rotating drum

9  that operates in conjunction with metal grates called

10  concaves on the bottom.  What that does is that knocks

11  all the leaves off the ear.  It also removes the kernels

12  from the shell.  And the kernels drop through the

13  concaves and drop through the grates, and then they

14  basically go through an air cleaning system up into the

15  grain bin of the combine.

16      Now, the combine itself, the interesting thing is,

17  is that its capacity for storage is limited, which is an

18  important factor with regard to harvest.  So roughly you

19  are talking between 310-420 bushels of capacity in a

20  combine, okay.

21      So if we could go to the video, Lisa.

22      We'll see if this works, and it kind of shows --

23  some of it's redundant.

24      (Whereupon, the video was played.)

25          MR. JOHNSON:  Okay.  What we're showing, again,

1   is the offloading onto the grain truck, and then -- if we
2   could stop it right there.  Okay.  This -- with this
3   particular grain cart -- this is an 1121.  This is one of
4   the accused products here.  And the -- you saw that the
5   auger was folding back down into a lowered position.
6   So --
7          Can we reverse that back up to show it offloading,
8   and then we'll do that again?
9          Okay.  So -- through all the dust, okay.  Through
10  all the dust, you could see that it was extended, all
11  right.  And there's various ways to refer to that.  The
12  extended position can be the offload position, it can be
13  the open position, you know, there's -- some people can
14  refer to it as the field position.  And by -- that is,
15  it's active in the field offloading the grain, okay.
16  When you fold it back down, it is in the transport
17  position.  And the significance of this is that there's a
18  limitation associated with these grain carts and with
19  regard to the front auger, referred to essentially as the
20  discharge auger or vertical discharge auger.  We can get
21  kind of technical mumbo jumbo, but the long and the short
22  of it, the reason that it folds back down for transport
23  is that these grain carts don't just operate in the field
24  but they're transported to and from the fields on legal
25  roadways, and they have to maintain certain width

1   limitations in order to safely and legally be moved about

2   from field to field.  So when it folds back down to the

3   transport position, then that is -- that is the safe

4   manner.  But it also -- because of the width of the grain

5   cart and the width limitations associated with the

6   Department of Transportation, it limits the length that

7   the discharge auger has with regard to these grain carts.

8        So having touched base a little bit on these grain

9   carts -- and I will cover in more detail, Your Honor,

10  later on a little bit more information about these grain

11  carts.  But having touched base on that -- Lisa, if we

12  could go to slide 3, please -- we're going to talk a

13  little history here.  And on the left-hand side of slide

14  3, that is your classic historic corn harvest technology.

15  Essentially, it's a horse-drawn carriage where the horses

16  are continually moving.  And I raise the point about the

17  continuous movement because that's important for harvest.

18  But they're continually moving.  The farmer is walking

19  along.  The farmer has a glove that has basically a metal

20  apparatus that helps snap the ear off, and then they toss

21  the ear into the cart.  And you'll notice the elevated

22  sidewall on the opposite side of the cart.  That is

23  referred to as a "bang board" because the ear would bang

24  off the board and then drop down into the cart.  So this

25  was back when ear corn was harvested.  They would take

the ear corn then and have to hand shovel it into dryer

bins, which essentially were bins that had wood slats

that had gaps in them to allow for air flow.  The reason

is, is that corn basically cannot be safely stored until

it is dried down to approximately 15 percent moisture

content.  So that's kind of the old technology.

Then moving to the right-hand picture, it's -- the

next advent is they can get more capacity out of the cart

by extending the sidewalls up over the wheels, so they

basically can go to the full extent of the axles for the

cart, increasing the capacity.  Again, that old cart,

tractor-drawn, but still hand -- hand offloaded, okay.

If we can go to the next slide, please.

All right.  Then we move on, and the next advent of

history with regard to these carts is the gravity wagon.

And this could be used for shelled corn or for ear corn,

but the long and the short of it is, if you'll note, Your

Honor, the flooring of the gravity wagon is angled down

so that gravity flows the product in the grain wagon down

to a discharge door, and that's discharged then out.

And if we can go to the next slide, please.

All right.  On the left-hand side is what's called a

portable auger.  And what these grain wagons would do is

you would take these -- if it was shelled corn, you would

basically take it to the auger and you would open that

1   up.  There was an inflow area for the auger, and it would

2   just flow the corn in there, and the auger would then

3   move the corn up and drop it down into a storage facility

4   on the farm or at the co-op.  So that's kind of the old

5   historic way.

6        The -- predating the portable auger, there were

7   actually -- there were actually auger assemblies that

8   were made out of metal, and they had essentially metal

9   plates with an elevated area on the bottom, and so those

10   were used for ear corn so you could dump into the -- that

11   particular conveyor assembly, metal conveyor assembly,

12   and that would carry the ears up and dump them down into

13   the crib where they could be dried down.  And then after

14   the corn was properly dried down, after that point in

15   time, it would be shelled, so the kernels would be

16   removed from -- from the cob.  And we -- I put a picture

17   of the gravity grain wagon up there just -- rather than

18   the drawing so you could kind of see just a picture of

19   it.

20        Okay.  If we could go to number 7.  There we go.

21        Now, 50 years ago -- I guess a little over 50 years

22   ago -- Jon Kinzenbaw was asked by a farmer to help with

23   regard to harvest and to come up with a way to get the

24   corn out of the field and to an appropriate vehicle or

25   vessel for storage or for movement, and Jon Kinzenbaw

came up with a grain cart.  And so 50 years ago, Jon
Kinzenbaw developed a dual auger grain cart that is very
similar to the one that's shown in the photograph here.
And the dual auger grain cart -- and we'll cover this
further -- but it has a floor auger, so that the grain is
mechanically moved forward to the -- to be received by
the discharge auger, which is shown in the folded or
transport position in there.  And then it had a spout
that was -- so that when the auger was opened up, the
spout would be directed into the truck or the vessel
receiving the grain.  The other thing is the -- in that
particular historic design, the discharge auger is
parallel with the front of the grain cart, so that it
opens up at basically a 90-degree angle to the grain
cart.

Okay.  Let's go to slide 13, if we could.

All right.  So we're going to talk a little bit
about the single auger grain cart, which is -- and,
obviously, the dispute here is between a single auger
grain cart and a dual auger grain cart, and so that's why
I'm laboring on the designs of the grain carts.  The
single auger grain cart example is shown here.  And on
the left-hand side, that's an overhead view looking down
into the box or the container of the grain cart.  That's
where the grain goes.  And you'll notice that the walls,

the interior walls, both the front, the back, and both
sides, are pitched or angled inwardly, so that it creates
a downward flow.  It uses gravity to flow the grain into
the very bottom of the cart, which is called the sump,
okay.  And with regard to the -- that particular area,
the mouth of the discharge auger was positioned at the
sump, so that the grain would by gravity flow down to the
mouth, it would be picked up by the auger, and then it
would be mechanically moved upward and out of the grain
cart.

        Now, you can see the sidewalls in the drawing on the
right.  You can see, again, the sidewalls sloping in.
One of the factors with regard to single auger grain
carts is that with having to slope the walls, all four
walls, it reduced the capacity of the cart.  So,
generally speaking, single auger grain carts were used in
smaller capacity jobs; you know, generally, they were
smaller of nature, in a general sense, historically,
okay.

        Now, the other thing, you'll notice the overhead on
the left, Your Honor, the design there was you have to be
centered.  You want to be centered with regard to the
location of the sump because that takes full advantage of
gravity, feeding the grain down into the mouth area for
the discharge auger.  So essentially, mechanically, you

1 are trapped by using the center, okay. What happens then

2 is, you want to move the grain out. You have one auger

3 to work with with a single auger, so you want to move the

4 grain out, so you do it in an angular fashion going

5 through, in this instance, the left front corner. There

6 are minority grain carts that go through the right front

7 corner, but, generally speaking, they go through --

8 through or over the left front corner. And then, if

9 you -- when you straighten out the discharge auger, a

10 straight line, basically, it's going to dump at that

11 particular angle, okay.

12      All right. Let's go to slide 16 and 17.

13      Okay. Now, on the left-hand side of this slide,

14 which I think is 16 -- thank you -- we have an overhead

15 view of a historic dual auger grain cart. And the floor

16 auger is highlighted in red. And so, essentially, this

17 grain cart -- a dual auger grain cart has larger

18 capacities historically. Generally speaking, the

19 capacity levels for dual auger grain carts, you know, run

20 from about 1,100 bushels to 2,700 bushels, so larger in

21 size, larger in carrying capacity.

22      Now, the significance here is there still is a slope

23 on the sidewalls, all right. But it -- it's -- it relies

24 upon gravity to get the grain down to the floor auger.

25 The floor auger then mechanically moves the grain from

rear to forward, and it moves the grain outside of the container or the box into a grain transport area. And the floor auger is mated up or is in proximity to the mouth of the discharge auger located within this grain transfer on the outside of the container at its front. And the grain is exchanged there, and then the grain is mechanically moved by auger up and out of the grain cart to the -- to the loading assembly, to the trailer.

Now, one of the significant things is, with regard to the Kinze products, is that, for example, the 1,500-bushel unit can offload at 750 bushels per minute, so basically a 2-minute offload time, so you'd have significant amounts of grain that are passing -- that can pass from the grain cart into the truck -- or into the trailer.

And on the right-hand side of this particular slide, this is the front -- and I'll talk in a little bit more detail about this -- but this is the front of the -- of the Kinze dual auger grain carts. This is -- this is the front as shown on four of the five accused models for Kinze, all right. And these are the larger models. But the blue highlighted piece is the base of the discharge auger that comes off the grain transfer. The grain transfer is in the middle there, and that's where the floor auger emerges out from the container into that

grain transfer, and then the grain is transferred to the
discharge auger.  And the casing for that is shown in
blue, and then we'll show you another picture that shows
the remainder of the bottom section or lower section and
then the top section for that.

Let's go to 8 and 9, please.

So, Your Honor, we're going to talk trucks now, and,
in particular, the '598 patent, claim 1, recites that the
grain is transferred into "open top semitrailer."  So
here's an example of the open top semitrailer.  The
technical term is dry bulk trailers, oftentimes referred
to as hoppers or hopper trailers, all right.  And the
picture on the bottom is an overhead view looking down
into the hopper.  And if you'll notice, there are --
there are two significant depressions there.  Underneath
each of those is a slider door.  And so for unloading,
what these do is they dump at the co-op.  And the walls,
if you'll notice, the front wall is -- is tapered
downwardly toward that pit, as is the back wall, for the
front section as well as for the rear section.

Let's go to the next one, please.

Here's a little bit better view, Your Honor.  If you
look at the top slide, you'll notice at the very front
there is very little shelf space associated with these
trucks.  They have the wall immediately tapering down

 1  toward the discharge area and similarly in the rear, all
 2  right.  And then what we have is we have an example of
 3  the discharge or the unloading of the hopper truck at the
 4  co-op, where they pull over the grate, they open the
 5  door, and gravity just, boom, drops this grain out, okay.
 6      Now, slide 10, we stuck this in here, Judge, just so
 7  you understand the grain is a granular material, okay.
 8  And the engineers have this fancy term called "the angle
 9  of repose," and what that is, basically, is that granular
10  material, such as grain, by simple virtue of the fact of
11  gravity's effect on it, is going to mound up.  It's going
12  to achieve a particular angle or the angle of repose.
13  And you'll notice in the offloading into a hopper
14  trailer, that grain is achieving its angle of repose, all
15  right.  And then we have a dry storage building, again,
16  just demonstrating the angle of repose for the grain.
17  Center dump, that conveyor auger is just dumping that in
18  the center and it's just achieving its angle of repose.
19      Let's go to -- if we could, just go to that video.
20  See if we can -- we have a couple videos here, Your
21  Honor.  Rather than just showing you the whole video, I'm
22  just trying to spot it, particularly since we saw the
23  video that J&M put together.  We'll see if I'm on target
24  or off target.
25      (Whereupon, the video was played.)

1      MR. JOHNSON:  Okay, this is 1121, model 1121.

2  This is one of the accused grain carts.  And there you

3  can see it offloading into the hopper trailer.  Again,

4  the grain is offloading, and the spout mechanism has a

5  tilt availability to it, and that is, you notice -- you

6  see the way it just went up there, so it can go back and

7  forth like this, Your Honor, okay.  But again --

8      Let's stop it right there, Lisa.

9      All right.  Again, you can see that in the loaded

10  grain truck, the grain has achieved its angle of repose,

11  and it's -- it -- it's available.  The other thing is, if

12  you'll notice, there's hoop framework over the top, and

13  this has -- and I think the next video shows it -- but it

14  has a canvas roll, and the canvas just rolls over and

15  sits on the hoop, so that as the grain is loaded there

16  with its angle of repose or, if you will, its point or

17  hump, it's still covered over.  And then, obviously, as

18  the truck starts to move, load vibration is going to

19  shake that granular material down to achieve a more even

20  top surface area.

21      Let's go to the next video -- or let's finish this

22  one and then go to the next one.

23      (Whereupon, the video was played.)

24      MR. JOHNSON:  There we go.  You see the canvas

25  going over the top.  And then we've got 301, if we

1  could -- about a 30-second video here.

2      Is it working?  It's going to stall on us a little

3  bit, huh?  Let's just jump ahead.  Let's just kill that.

4      Okay, Your Honor, so now part of the -- this is kind

5  of part of the discussion about the harvest in general,

6  and I call this section "harvest tradeoffs."  But I think

7  that from a purely functional standpoint, the key thing

8  for the harvest is to keep the combine moving.  If the

9  combine's sitting still, it's not picking corn.  If the

10  corn's not getting picked, you're burning time.  And time

11  is of the essence with regard to the harvest.  And I'll

12  cover some of the details for that, but the key is to

13  keep the combine running.  And, you know, if you stop the

14  combine to offload it at a truck, that's down combine

15  time.  It reduces efficiency.  If you stop the combine to

16  unload it with a grain cart, that's downtime or lack of

17  efficiency.  So that's kind of contrary to the basic

18  concept of efficiency, that is, to keep the combine

19  running.

20      Now, combines have gotten larger and larger.  The

21  horsepower for the combines has gone up exponentially.

22  And what that allows is a platform where you can pick

23  more corn.  So these corn heads I told you about with the

24  row units, you know, they have row units that are at or

25  above 16 rows.  And so, essentially, if you think about

1  it, the combine can pick 16 rows of corn in a single

2  pass, and so that's pulling a large volume of corn into

3  the combine.  Its storage bin capacity is a limiting

4  factor, so you need to make sure that you are offloading

5  that combine for efficiency purposes.

6      Smaller combines -- I can just give an example.  The

7  larger combine, a 16-row unit, can pick 5,000 to 7,000

8  bushels of corn per hour.  Smaller combines, using a

9  12-row corn head, can average 2' to 3,000 bushels of corn

10 per hour with regard to the harvest.  And so with grain

11 bin capacities of 320 to 410 pounds, you're talking about

12 offloading the grain bin of the combine every 6 to

13 10 minutes roughly, just general rule of thumb.

14      So if we can show our video at 420.  Let's see if

15 this one works.

16      Okay.  Here we go.  So this is an example, Judge, of

17 the efficiency of using the combine.  You'll notice that

18 the grain cart is being pulled by the tractor at the same

19 speed as the combine.  So this allows the combine to be

20 offloaded into the grain cart, emptying its bin, and it

21 continues to just offload into the grain cart.  And then

22 when the grain cart needs to offload onto a semi, you've

23 got storage capacity in the bin to have the grain cart go

24 and unload and get back.  But, again, the timing is

25 significant.  If you are talking a 6 to 10-minute time

1  period before that combine fills up, you've got to get

2  the grain cart to the trailer, you want that unload time,

3  so the -- basically 700, 750 bushels a minute offloading

4  that, and then get that back on point with regard to the

5  combine, so that's part of this efficiency in harvest

6  that we're talking about.

7       Now, the other aspect of harvest that -- there are

8  two other aspects of harvest that are beyond the farmer's

9  control, beyond the agricultural manufacturer's control.

10 Number one is the Iowa Department of Transportation and

11 Federal Department of Transportation regulations.

12 General rule of thumb -- and there's an 80,000-pound

13 weight limit for semi tractor trailers, all right.  The

14 significance has to do with how much capacity or how much

15 corn or how many beans or how much wheat you can haul out

16 of that field or away from that field to the co-op or the

17 other storage facility.

18      The other bottleneck or the other issue is

19 essentially weather related, weather and maturity, so

20 I'll talk a minute about that.  Essentially, corn can be

21 harvested at 20 to 30 percent moisture level.  The

22 problem with harvesting the corn early in the harvest

23 season is that if it's more moist, it can have excessive

24 kernel splits or kernel fractures, all right.  The

25 significance of that is, number one, it provides the

```
 1   opportunity for deterioration of the grain if the grain
 2   is retained.  Number two is, when you start splitting
 3   that grain, the cleaning system of the combine -- which
 4   is basically a heavy fan or a large fan -- will blow
 5   those fines or blow those broken kernel pieces out the
 6   back of the combine, so you're losing yield with that, so
 7   you have negatives.  You also have stalks that are
 8   greener.  They're harder to harvest.  They're harder to
 9   basically break down going through the combine.  So there
10   are negatives with regard to an early harvest.
11        The optimum goal, the storage goal is 15 percent
12   moisture level or less for corn.  So a lot of farmers,
13   what they try to do is field dry their corn.  They're
14   going to leave the corn standing in the field and try and
15   pick it later in the harvest season.  And the difficulty
16   is, if you wait too long, then you increase your yield
17   loss because you have stalk lodging and ear drop.  Stalk
18   lodging basically is where the cornstalk just drops over
19   or leans over, and it's harder for -- it's harder for the
20   head of the combine to capture that stalk to bring it
21   into harvest, the ear of corn off of that stalk.
22   Stalk -- you know, ear drop is pretty simple.  Plop, and
23   it drops to the ground.
24        So with regard to beans, soybeans, if you wait too
25   long in harvest, the pods can become brittle and the
```

 1  beans can basically break open and drop out, so you are

 2  having the potential of loss there.  If you are -- if you

 3  are too early, then what you have is you have beans that

 4  can spoil more quickly.  So there's kind of an optimum

 5  window in harvest to pick these crops.  And the key thing

 6  about the efficiency of harvest is you are trying to take

 7  advantage of that optimum window to maximize yield for

 8  the farmer.  And if there's one word that drives the

 9  farming community more than any other word, that word is

10  yield, Your Honor.  So we're talking about how the

11  efficiency of harvest plays, and, thus, we're talking

12  about how the grain cart plays into that efficiency.

13      The other aspect, I will tell you, is with regard to

14  weather, Ohio State University extension service did a

15  study, and they basically concluded that in October, the

16  last half of October -- so if you will, the first part of

17  decent harvest season -- there's about nine days, nine

18  field days available, and in the first half of November

19  there's about eight field days available.  So if we take

20  that, and then if you look at if there's been rain or

21  moisture, then you've got the potential of mud in the

22  fields, which prevents or slows down the use of

23  equipment, number one.  Number two is the farmers will

24  tell you they don't like to drive heavy equipment on

25  their fields because of the issue of compaction, and that

 1  is, what you are doing is you are squishing the soil down

 2  making it more dense.  And the studies show quite clearly

 3  that if you have compaction issues with your soil, that

 4  negatively affects your plant emergence.  It affects your

 5  yield the following year or years.  So the goal is to try

 6  and optimize your conditions in these tight windows to

 7  pick the crop and not damage the soil.

 8        So kind of turning back to the Department of

 9  Transportation rules in Iowa, you are talking about

10  80,000 -- generally, an 80,000-pound maximum load; you

11  are talking about a maximum width of the trailer of 102

12  inches and a maximum length of the trailer of 53 feet.

13  General rule of thumb, a tractor and trailer can equal

14  about 35,000 pounds unladened.  The term of art they like

15  to use is "unladened."  I would call it "unloaded," but

16  they call it "unladened," okay.  Aluminum hoppers, so if

17  you use aluminum and get rid of the steel aspect of the

18  hopper, you can reduce weight by about 2,500 pounds.  So

19  assume that you've got a truck -- a tractor trailer rig

20  with an aluminum hopper trailer, you're at 30' or 32,500

21  pounds unladened, unloaded.

22        The U.S. Department of Agriculture has standardized

23  weights with regard to grains.  So with corn, the

24  standardized weight is 56 pounds per bushel.  With

25  soybeans, the standardized weight is 60 pounds per

bushel.  And with wheat, the standardized weight is

60 pounds per bushel.  So essentially, if you are going

to make -- or meet the 80,000, the general rule of thumb,

80,000-pound weight limitation, you are talking about

offloading 850 to maybe 1,000 bushels of grain into the

hopper before it is -- before it goes illegal.  And with

regard to hopper trailers, they have substantial

capacities.  For example, a hopper trailer that's only

40-foot long, not 53 feet, it's only 96 inches wide, not

100-some, and with a 66-inch high sidewall, it's got a

heap capacity of 1,156 bushels, all right.  43-foot long

has a heap capacity of about 1,400 bushels.  So

essentially we're talking about capacities in these

trailers that exceed the legal ability or the legal limit

associated with transport.  Because I will -- I will tell

you that if you have 1,100 bushels of corn, you've got a

pretty healthy -- you've got a pretty healthy weight, and

you -- you combine 1,100 bushels of corn with a trailer,

you are going to be exceeding 80,000 pounds.

    So let's kind of jump now to slide 11.  Let's start

with slide 11.

    Okay.  We're going to talk about -- this is the -- a

drawing of the J&M single auger design.  And again, it

shows basically the sump area where they claim that they

have a constant turning, if you will, in that sump area,

with gravity pushing the grain down into that, and you'll notice that then the -- the discharge auger starts in that sump area and emerges upwardly and outwardly from the left front corner of the grain wagon.

Let's go to the next one.

All right.  This is a Kinze single auger grain cart. This is not an accused product in this case.  And you'll notice that similar to the design on limitations of the J&M cart, you've got the auger going down to the center position sump, and then the lower part of the discharge auger is within the container, emerging from the left corner of the container and upwardly and outwardly from that.

Let's go to the next one, please.

All right.  I think we've chatted about that enough. Let's go to the next one.

All right.  And then here is a -- the J&M carts. The two on the left are single auger carts, and then they also have a dual auger cart where they have positioned the discharge auger within the container and have it emerging from out of the container at the -- pardon me, the lower part of the discharge auger is within the container.  The handoff, if you will, of the grain from the floor auger to the mouth of the discharge auger takes place inside of the container.  That is different than

the Kinze product.  So the long and the short of it is,

is that with single auger carts, the general design of

the single auger carts, the discharge is always affixed

to the corner of the container for the single auger cart

in the configuration where it's angled downwardly and

backwardly into the center of the container, the sump

area.  And then drawing that straight line, it comes

forwardly and outwardly once it emerges from the corner

of the -- of the cart.

The dual auger cart is different.

If you can go to slide 15, please.  No, no, no.

That's -- that's -- let's go to the next one.

Okay.  The dual auger -- the Kinze dual auger cart

is different in terms of its -- again, it has to do

with -- it has its center auger; transports the grain

outside of the container.  The grain is fed to the mouth

of the discharge auger within the grain transfer at the

front of and outside of the container, and then it

proceeds out -- out and up and away from the container.

So the key feature associated with the accused

products, all five models of the accused products in this

case, Your Honor, is the ability of the discharge auger

to move.  And we're not talking about the tip spout

moving.  We're talking about the entirety of the

discharge auger moving.  And within and as a part of the

grain transfer, Your Honor, we have a gasketed hinged
connection so that the -- essentially, the discharge
auger -- if you don't mind me using my elbow and my hand,
the discharge auger can be rotated in this fashion, out
and back, out and back. So what that does is that
extends -- let's say the farmer misses his mark with
regard to the trailer and he's not close enough to the
trailer. He can actually extend the discharge auger out
this way and put it over the center point of the trailer,
which is the traditional point for offloading the grain
into the trailer.

    And in this particular drawing on the right, Judge,
we have a couple of features that are significant with
regard to that operation. Not only the transfer area --
you can't see the hinged joint, but that's where it is.
And then the blue -- highlighted blue lower portion of
the lower section, that's going to tip outwardly. But
also at the top on the -- just left of the center, the
drawing there is a bracket, and what that is, is that's a
bracket to which is attached a piston. And then on the
right-hand side is a shelf area, and that is a shelf area
where there is a roller that rolls on there.

    Let's see if I can -- okay. Judge, so using the
drawing from slide 16 of the tutorial, and then taking a
photograph that is found -- it's an attachment to the

1 amended complaint; it's ECF 15-2 -- what we've done is we
2 were showing you that lower portion, the lower section of
3 the lower portion of the discharge auger. And you'll
4 notice, we've got it circled in red on the right-hand
5 side, showing that it is affixed to the grain transfer at
6 the front of and outside of the container.
7     And then, Judge, although my placement is less than
8 artful, what this photograph shows is, again, we're going
9 to kind of -- we're going up the discharge spout, so
10 we're seeing the top half, if you will, of the lower
11 section of the discharge auger casing, the joint, which
12 is where it folds back on itself, and then the upper
13 section of the discharge auger is shown and labeled
14 there. Now, the reason for this particular picture is it
15 shows that track assembly that I mentioned earlier, and
16 it has the roller assembly on that. So that arm, if you
17 will, coming out at you from that photograph, that arm,
18 essentially what it does is it holds the rollers, and so
19 as this -- as this discharge auger -- it -- it is pushed
20 out by the pistons. So the piston is a cam piston. It
21 works out and back, out and back. So it pushes that
22 auger parallel with the front of the grain cart out
23 towards you. And it -- it -- that roller, it rolls down
24 the track, and then when the piston retracts and pulls it
25 back up, that roller rolls up the track. So that's what

those two apparatuses are on the front portion of the
grain cart that are attached to the lower section of the
auger.

Let's go to slide 17, if you wouldn't mind.

Okay. Your Honor, this is the fifth, if you will,
of the accused products. And I should, I guess, clarify,
this is the smallest of capacity. The other accused
products are a 1,300-bushel, 1,400-bushel, 1,500-bushel,
1,700-bushel grain cart. They have the apparatus that I
just discussed with you, with the piston assembly that's
affixed there and the roller, all right. This is the
1,100-bushel, the 1121 model. It doesn't have that,
okay. It's -- if you'll notice, Judge, the black portion
at the front of that, that's the -- where the discharge
auger goes into, that's the grain transfer area. Like
the larger carts, it has a gasketed hinge that allows it
to pivot. And what it does is it pivots parallel with
the front of the grain cart. Again, it pivots out and it
pivots back. You'll notice there's a piston. The black
elongated piece in the -- about halfway down, there is a
piston which can extend to move it out and then retract
to pull it back. So this is slightly different because
of the configuration. The cart -- the front of the cart
here is straight or flat, if you will.

Now, the key -- let me go back to this, if we could

1  switch back to the ELMO.

2      Okay.  All right.  So the key difference, if you

3  will, Your Honor, between the Kinze dual auger grain cart

4  and the J&M single auger grain cart and the patent that

5  we're talking about here is that the dual auger grain

6  carts, all five of the accused products, have a discharge

7  auger that need -- that is moveable, and it needs to be

8  unencumbered by the container so that it can move

9  outwardly and backwardly.  And that's a significant

10 difference that's presented by each of the five accused

11 products here.

12     Thank you, Your Honor.  I -- I'm sorry if I ran too

13 long.  If there's any questions, I'd be delighted to deal

14 with them right now.

15          THE COURT:  I'm a little confused on what, if

16 anything, does Kinze have at the top of the auger

17 discharge that moves or directs the direction of the

18 grain.

19          MR. JOHNSON:  I'm sorry, sir, I missed the

20 first part of your question.

21          THE COURT:  Yeah.  What, if anything, does

22 Kinze have at the top of the discharge that directs the

23 direction of the grain?  Is there anything that --

24          MR. JOHNSON:  It has a piston assembly.

25          THE COURT:  Well, the piston assembly moves the

1  entire auger.

2          MR. JOHNSON:  There's a second piston assembly

3  at the top.

4          THE COURT:  Okay, at the top as well.

5          MR. JOHNSON:  At the top.  And what it does is

6  it allows the spout to go up and down like this.

7          THE COURT:  Okay.

8          MR. JOHNSON:  Okay.  And we would contend, Your

9  Honor, that's old art.  That's not covered by the patent

10  at issue.  The patent at issue basically covers coming up

11  the auger casing and taking a very slight left-hand turn,

12  and then having your spout there that goes back and forth

13  like this, all right.  But this -- this -- the mobility

14  of the spout up and down we believe is old art.

15          THE COURT:  Okay.  All right.  Thank you.

16      Mr. Blackburn, I want to give you a chance to

17  respond, if you will, to the tutorial, if there's

18  anything that you think you want to add to your tutorial.

19          MR. BLACKBURN:  Thank you, Your Honor.  No, I

20  think that, since we're about to argue the motion for

21  judgment on the pleadings, it's going to cover the same

22  ground I think, I think I'll just respond then.

23          THE COURT:  All right.  Very good.

24      Tell me what I'm missing, but it seems to me that

25  the solution to trying to get more grain into a truck

```
 1   like this is to shake or vibrate the truck itself, to
 2   disperse the grain from angle of repose, to have it all
 3   spread out, because that's what happens as the truck goes
 4   down the road.  So why not just shake the bed of the
 5   truck as it's being loaded and then you don't have to
 6   worry about the angle of repose, and everything goes to
 7   the corners and you've got it all done?
 8           MR. BLACKBURN:  Right, and I would agree, that
 9   happens.  The problem is, when it's going down the road,
10   is that you've already filled up and not filled your
11   entire cart, right, because you are not --
12           THE COURT:  Right.  So do that, shake it --
13           MR. BLACKBURN:  Why not have a truck that
14   shakes?
15           THE COURT:  Yeah.  Why not shake the truck as
16   it's being filled and then everything spreads out and
17   you've got it all solved?
18           MR. BLACKBURN:  I think we've got a patent
19   coming, Your Honor.
20           THE COURT:  Yeah.  I'll quit my job.
21       (Laughter.)
22           THE COURT:  All right.  So let's go ahead and
23   move then to the motion for judgment on the pleadings,
24   and this is the defense motion.  So I'll hear, I guess it
25   is -- is it Mr. Kennedy addressing me on this?
```

1          MR. KENNEDY:  Yes, it is, Your Honor.

2          THE COURT:  Very good.  Mr. Kennedy.

3          MR. KENNEDY:  I'm going to -- I'm just going to

4   switch over here.  I plan to use the ELMO, so I'm going

5   to switch with --

6          THE COURT:  Certainly.

7          MR. KENNEDY:  Thank you, Your Honor, for your

8   time.  I think the first question that I would want to

9   hear if I were the Court is can we address this at a Rule

10  12(c) stage, and the answer is, yes.  You can address a

11  question of noninfringement and a question of limitation

12  of scope of a patent at a Rule 12(c) stage.  It's an

13  appropriate mechanism to address in a patent case without

14  claim construction if there are not factual disputes that

15  need to be resolved through claim construction, and we

16  propose that that is the case here, Your Honor.

17         Rule 12(c) employs the same analytical framework as

18  a Rule 12(b)(6) motion.  Rule 12(b)(6) motions are

19  regularly considered in patent cases, and we actually had

20  a Rule 12(b)(6) motion pending earlier prior to the

21  amended complaint in this case.  The question then is why

22  and how is it appropriate to address Rule 12(c) without

23  claim construction.  And the first thing I would point to

24  is that claims have meaning.  They have meaning prior to

25  a court formally construing them, and they need to have

 1   meaning.  And part of that is the public notice function

 2   of claims.  The Supreme Court in the *Nautilus v. Biosig*

 3   *Instruments* case talks a bit about the public notice

 4   function of a patent claim.  Specifically, as you can see

 5   here, it talks about the need for a patent claim to be

 6   clear enough for the public to understand what is still

 7   open to them.  And so if claims could not have meaning

 8   apart from claim construction, the public notice function

 9   would be defeated and the public wouldn't have the

10   ability to understand what the meaning of claims are to

11   design around patents, to work around them.

12        The second feature of why a 12(c) motion is

13   appropriate at this stage is judicial efficiency and

14   efficiency for the parties.  Federal Rule of Civil

15   Procedure 1 states that cases need to be construed,

16   administered, employed by the cart -- court and parties

17   to secure just, speedy, and inexpensive determination of

18   every action and proceeding.

19        COURT REPORTER:  I'm sorry, could you slow down

20   just a little bit for me?

21        MR. KENNEDY:  Yes, absolutely.

22        Federal Rule 1 states that the -- every case should

23   be construed, administered, and employed by the court and

24   the parties to secure the just and speedy and inexpensive

25   determination of every action and proceeding.  Now,

obviously, there's many actions that that's not
appropriate because there are claim construction issues
that need to be addressed, but we would raise that that's
not the case here, and there's a few reasons for that.
Certain actions that a patentee can take during the
drafting of their patent application, during the claiming
of their patent, and then during representation -- or
representations made to the USPTO can make a patent ripe
for consideration at an earlier stage.  Some of those
actions occurred in this case, and we'll talk about
those.

     I point out as well in our briefing that we had
cited the *Cumberland Pharma.* case, *versus Sagent Agila*,
and that was a case that was looking at an early motion
to dismiss based on the term "free of chelating agent."
In that case, the court was able to rule without claim
construction that the term "free of chelating agent" had
sufficient meaning in light of the patent specification,
in light of the examination history, that they didn't
require construction.  It didn't need to evaluate how
much degree was left by free, what specifically
constituted a chelating agent, whether that was in the
defendant's products or not.  And that case was cited in
our briefing as an example of a Rule 12(c) case.  There
are other Rule 12(c) cases we didn't cite but we'd be

happy to provide to the Court if the Court felt that that was helpful.

Moving to what actions can a patentee take and what actions did J&M take to limit the scope of their patent, they took a number of actions. First of all, they've been consistent and clear throughout the specification and examination of their patent that it's limited to a single auger corner -- or single corner auger style grain cart. This is clear from the specification. It's clear from the patents that they incorporated by reference to satisfy the description and enablement requirements for their application. It's clear from the type of patent claim that they elected. They use a *Jepson*-style claim, and we'll talk about what that means. And it's also clear from the remarks that they made at the patent office in order to obtain their patent.

Only now in accusing Kinze's products of infringement are they seeking to expand the scope of this and making representations that it applies equally to non-single corner auger style grain carts. Examples of what they did in the specification: They utilized the present invention language while disclosing a single embodiment; they rely on incorporation by reference of six different patents. That's specified in the background section and then again relied on in the

1    summary of invention.  Those patents relate to single

2    auger, specifically corner auger, style grain carts.

3    They use a *Jepson* claim format, and then they made those

4    arguments to the examiner.

5        Use of present invention language is not always

6    indicative of a single embodiment; however, there's

7    actions where you only disclose a single embodiment in

8    conjunction with referring to it singularly as a present

9    invention, not inventions, that the patent can be

10   construed to be limited to that single invention

11   embodiment.  Here, J&M has a sparse description, and they

12   rely primarily on earlier patents from the lineage of

13   patents related to the single corner auger style grain

14   carts invented by the same inventors.

15       We discussed four of those patents in our brief, and

16   I'll put this up here for the Court.  You can see here

17   that in the background of the invention, the application

18   starts with "The present invention relates to a grain

19   wagon or grain cart," and then describes "an unloading

20   auger conveyor of the type disclosed in these patents,"

21   specific to these six patents, and then those are

22   incorporated by reference, which we'll talk about in a

23   moment.

24       And then, here -- this is a little crooked; excuse

25   my -- kind of force this to fit on the ELMO -- you can

1  see again in summarizing the invention, "J&M states the

2  present invention is directed to," and I won't read the

3  entirety of this paragraph, but describes the summary of

4  what's claimed, and then it says, "as disclosed in the

5  above-mentioned patents." So, again, they've connected

6  that this askewed discharge auger is of a single auger

7  grain cart style, relayed in those earlier patents that

8  are incorporated by reference.

9      Now, J&M claims that they have a disclaimer in their

10 patent specification -- and I can put the disclaimer up

11 here -- that expands the scope beyond, you know, the

12 singular embodiment described, and that is right before

13 the claims column 4, so this column, around line 20, for

14 the Court's attention. And this is boilerplate that's

15 used in patent specifications. Something similar to this

16 is used very often. They say, well, you know, this

17 particular -- these particular embodiments have been

18 described, preferred embodiment --

19      COURT REPORTER: I'm sorry, could you use maybe

20 a lavaliere microphone because --

21      MR. KENNEDY: Yeah, I apologize, yeah.

22   It's used to describe specifically that you've

23 identified a preferred embodiment, that there's

24 variations that can be applied to that embodiment. But

25 it's a boilerplate that's used commonly in patents just

1   preceding the claims.  And, in fact, in the *Verizon* case,
2   which we cited in our brief, the Federal Circuit affirmed
3   a finding that the claims were limited to a singular
4   invention based on the disclosure of a single embodiment
5   in use of the present invention language.  And in that
6   *Verizon* case they had a very similar disclaimer paragraph
7   preceding their claims as well.  And that -- there's
8   three patents, I should specify, in the *Verizon* case that
9   are addressed.  The patent that was considered to have a
10  singular embodiment based on the present invention
11  language in the scope of the disclosure was the '880
12  patent.  The other two patents were not challenged in
13  that respect.
14       Speaking again about the "incorporation by
15  reference," I want to draw the attention to the Court as
16  to what "incorporation by reference" is used for and how
17  it works, so let me put up here the -- the Manual of
18  Patent Examining Procedure largely is utilized in
19  examination and gives guidance to the patent examiners as
20  to how to examine a patent and how to reject it.  It's
21  based on the Code of Federal Regulations, so most of the
22  provisions are taken from 37 CFR, and then it's a guide
23  for patent applicants to respond to the patent office or
24  how to follow the regulations.  So the Manual of Patent
25  Examining Procedure specifically states, as you can see

here, that you can incorporate text from something else
as a shorthand way of explaining your invention.  This is
useful for purposes of enabling your invention so that
folks understand how to make and use it, which is kind of
the bargain that you get when you provide a patent.
You're disclosing some new technology to the public and,
in exchange, getting a limited monopoly on that
technology.  And you can see here from the MPEP that when
a patent is incorporated by reference, it's as if the
entirety of it is verbatim put into the application.  So
simply by saying, "Well, we incorporated that.  We're not
limited to that -- the embodiments disclosed therein," is
inconsistent with the MPEP, which says the entirety of
that is put forth as though it's there in its entirety.
And this is consistent with what the Federal Circuit has
held, and you can see here, this -- this case, *X2Y*
*Attenuators,* is cited in our opening brief, and you can
see here that the Federal Circuit, consistent with the
MPEP, has said that incorporated patents are effectively
part of the same disclosure.  So when the J&M '598 patent
relies on these earlier patents and says "This is for a
grain cart with an auger conveyor of the type disclosed
in," they're relying on those single corner auger style
grain cart designs for defining the structure and also
for enabling and teaching folks how to make and use that

1    structure.

2        I think one thing that's interesting, in my mind, is

3    the claims talk about this folding action.  And you've

4    seen in both technology tutorials some of this movement

5    with the folding action.

6        Just looking where the -- here we go, okay.

7        It's the pink section here -- and I'll zoom in a

8    little bit -- and you can see in the highlighted pink

9    section there, Your Honor, that the claim specifically

10   describes this folding movement and an apparatus that's

11   sufficiently supporting that folding movement and

12   extension movement.  And if you look at the '598

13   patent -- I'll zoom -- sorry that I'm zooming in and out,

14   in and out here, but I do like the use of the ELMO,

15   so . . . you can see there's no images or figures that

16   depict the folding movement or the folding position.

17   Instead, J&M has chosen to rely on, as I said, one of its

18   earlier patents, what I'll refer to as the '830 patent.

19   And that is the last three digits of the patent number.

20   It's one of the patents listed in the background section

21   as incorporated by reference and then later referenced

22   again in the patent.  And if you see here, you can see

23   again this corner single auger style cart, and figure 2

24   shows the folded position.  So the '598 patent did not

25   show the folded position or depict how that folding

mechanism works or movement works or how the structure

necessarily is supporting that folding movement as is

claimed, but the '830 patent does.  And again, here, you

can see it in figure 3 of the '830 patent.  So you can

see that in explaining what the invention is and

explaining how the device works, J&M is relying on the

disclosure of the single corner auger style grain cart

from the '830 patent.

Another way, as I mentioned before, that J&M

specifically limited this -- the '598 patent is by the

type of claim that they use.  They use a *Jepson* claim.

It's J-E-P-S-O-N.  I actually was in, like, a store the

other day and I saw some, like -- you see the patent

artwork where you have, like, the drawings, and it was a

*Jepson*, it was the *Jepson* invention, which was a coffee

pot, like an improved percolator coffee pot.  I love

coffee so it caught my attention.  But a *Jepson* claim is

distinct from a claim for a particular device in that a

*Jepson* claim is specifically an improvement claim.  And

so what you do in defining a *Jepson* claim is you lay out

what that device is.  You say it is this device and it's

an improvement for that device.  So you're admitting that

much of it is not your patented invention, but it lays

out the structure of what that invention is because you

are providing an improvement for that particular

structure that existed before.  And what denotes that is
language that says "the improvement wherein" or "the
improvement wherein comprising," so that's how you know
that something -- you get cued in that something is a
*Jepson* claim.  I'll show you on the '598 patent, just
after the pink highlighted section that we took a look at
before, you can see "the improvement wherein."  And
that's -- that's a key -- a cue to it.  And also J&M has
admitted in their answer to Kinze's answer and
counterclaims that this is, in fact, a *Jepson* claim, so
this is not a dispute as to whether or not the claim is a
*Jepson* claim.  The parties are in agreement that it is.
And so this type of claim relies on that earlier
structure and then provides an improvement for that
earlier structure.

I'd point the Court to the *Rowe v. Dror* case cited
in our brief.  And the Court there stated, as I'll --
I'll read briefly, "The so-called *Jepson* form," that's
because there's other -- you can also claim improvements
before the existence of *Jepson*; it just became named
*Jepson* after the *Jepson* case -- "suggests the structural
importance of the recitations found in the preamble."
And the preamble is that section leading up to "the
improvement wherein."  So you are defining that preamble.
That's the admitted prior art of your earlier structure.

"When this form is employed, the claim preamble defines not only the context of the claimed invention, but also its scope.  Thus, the form of the claim itself indicates" -- in that case Rowe -- "Rowe's intention to use the preamble to define, in part, the structural elements of his claimed invention."

So, again, we reiterate that this type -- it's not just there's present invention, it's not just that there's incorporation by reference, but there's also this *Jepson* claim format.  So all of those things together are showing that this is a single corner auger style cart that's required.

Another action that was taken by J&M is during examination.  So you file your patent application.  It goes to an art unit, which, you know, they have art units for medical devices, pharmaceutical compositions.  You name it, there's different art units.  And an examiner takes the patent, they review the specification to make sure that it's consistent with the MPEP and the Code of Federal Regulations, and they look at the claims, and they make sure that the claims are sufficient under the statutory rules.  So there's a variety of different statutory rules, and they search the claims based on prior art.  So you can have rejections based on the language that's used, ambiguities in the language, and

you can have rejections based on prior art where they say
that the claims aren't novel because somebody already
disclosed everything that's contemplated in the claims,
or that the claims are obvious, because it's an obvious
variation of, say, two pieces of prior art mixed
together, or your change is a simple change and it would
be obvious for someone to understand you could modify
something that existed already to achieve that.

So during examination -- that process is called
"prosecution" sometimes and also called "examination."
During examination, J&M faced rejections and they amended
the claims. The way that J&M chose to amend the claims
wasn't through -- you can do strikethrough for, say, a
clause and then underlining the new language, the new
words that you want to add. That's an option you can do.
You can just literally put "track changes" on and revise
the claim language. Or you can cancel the original claim
that you have and apply changes to it and place that
claim as new. Either way, those are considered claim
amendments that are made to change the scope of the claim
in response to the office action, and that's how J&M
proceeded.

And at the patent office, they had faced an office
action, and the examiner characterized the invention a
particular way, and they responded. And I'll put -- this

1  is -- this is from ECF 27-4 in our supporting document

2  for our brief.  It's the difference between the

3  two-column patent layout and the single-column, Your

4  Honor.  You can see that J&M then responded to the patent

5  examiner explaining what the invention is directed to and

6  the problem that it's directed to.  And some of this was

7  addressed through the technology tutorial, about the

8  completely filling the semitrailer, but you can see

9  what's underlined here, from a single auger corner cart,

10  as shown in fig 1 of the '546 patent -- that is one of

11  the patents incorporated by reference in the beginning of

12  the application -- fig 8, patent number '757, and in

13  paragraph 1 of the above application.  So, again, they're

14  referencing those earlier "incorporated by reference"

15  patents, those earlier J&M patents directed to the single

16  auger -- or the single, I should say, corner auger style

17  grain cart, and then reiterating to the examiner, no,

18  this is about a single corner auger style cart.  That's

19  what this patent application is directed to.

20      And that has impact because it's -- again, one, it's

21  emphasizing what we've already seen with present

22  invention, what we've already seen with the *Jepson*-style

23  claiming and the incorporation by reference, but also

24  because the patent prosecution history or examination

25  history is there to provide the public with

1    understanding, going back to the *Nautilus* case where we

2    talk about the public notice function of patents and how

3    claim terms have meanings, even if they're not formally

4    construed by the Court.  And in the Federal Circuit --

5    this is cited in our brief -- the *Hockerson-Halberstadt*

6    case, it's a 2000 Federal Circuit opinion, the court says

7    "The prosecution history constitutes a public record of

8    the patentee's representations concerning the scope and

9    meaning of the claims.  And competitors are entitled to

10    rely on those representations when ascertaining the

11    degree of lawful conduct, such as designing around the

12    claimed invention."  And that's 222 F.3d 951, at 957,

13    cited in our opening brief.

14        And so I don't want to belabor the point, but

15    there's a series of actions -- I won't repeat them all

16    again -- that J&M has taken to self-limit the structure

17    to a single corner auger style cart.  And as you saw

18    through the parties' technology tutorials, in particular,

19    Kinze's technology tutorial, the accused devices that

20    Kinze has are dual auger style grain carts, not single

21    corner auger style carts, such that the auger is

22    separate, it's outside of the container, and there are

23    other structural distinctions regarding how the folding

24    arm is supported.

25        So we, as a first matter, believe that the J&M

 1  patent does not apply to dual auger carts based on the

 2  limitations of scope that J&M voluntarily undertook in

 3  drafting their patent application and during examination.

 4  There's a separate basis asserted in the motion that it's

 5  clear, without the need for claim construction, that

 6  there's noninfringement, and for some of those same

 7  reasons that we just talked about structurally, and I'll

 8  get into that here briefly before I wrap up.  There's two

 9  particular portions of the claim language that I'd like

10  to draw the Court's attention to.  One is the yellow

11  highlighted section where it talks about the auger

12  conveyor being mounted on the container.  And you've seen

13  in the J&M patent application what their embodiment of

14  that looks like and also in the images that we've had in

15  front of the Court here.  This is figure 5 from the

16  patent at issue in suit.  You can see how that corner

17  auger is mounted on the container.  The pleadings -- and

18  this is -- this is a copy of an image from the complaint,

19  and I should -- the amended complaint, I should specify,

20  and we've removed the lettering that was used to

21  designate this portion and added labels, but the piece

22  that's identified by J&M to satisfy this mounted position

23  is the piston bracket and the roller track that are used

24  to pivot the auger parallel with the front of the

25  container such that it can extend a further distance or

 1   be closer and higher in height.  We believe that the

 2   Court does not need to construe the term "mounted."  And

 3   if the Court thinks that it needs to construe the term

 4   "mounted," then, you know, then that portion of our

 5   motion would need to proceed to claim construction, if

 6   the Court doesn't agree with the limitations in scope

 7   basis that I just spoke about.  However, we believe --

 8   and we believe that there's support in the case law cited

 9   in our brief -- that that's unnecessary because the claim

10   terms have a basic meaning to the public, and Kinze does

11   not mount the auger in the way that the claims direct on

12   the container.  Instead, the only -- and I should also

13   specify that there's a difference between the 1121 Kinze

14   device and the 1321, 1421, 1521, and 1721 devices.  The

15   1321 through 1721 devices have -- Mr. Johnson showed

16   it -- have this mounting -- this mount -- or not

17   "mounting," this piston bracket and the roller track,

18   which J&M has alleged is mounted on.  The 1121 is a

19   reprisal of the old Kinze grain cart, where you saw that

20   old image of the Kinze grain cart Jon Kinzenbaw

21   originally designed, and it has that perpendicular auger

22   that's just -- it's -- it just comes off the side of --

23   this is the grain cart.  It's coming off just at this

24   angle right here, right.  So the 1121 has that and does

25   not have the piston, the piston bracket or the roller

1  track.  It has that separate piston.  But specifically,

2  with respect to the 1321 through 1721 grain carts, the

3  support for -- that J&M has cited for the mounted feature

4  being present is this piston bracket, which is just used

5  to control the movement of that auger arm being pivoted.

6  And I can -- this is another image.  I'll kind of flip

7  through a couple of these just for the Court's -- so you

8  have different views of them.  And you can see here,

9  that's the 1421.  And this is, again, from the pleadings.

10 We've identified the lower section, the upper section,

11 and that roller and track.  This view here, you can see,

12 this is the piston.  The roller track is over here.  So

13 that piston extends, and that roller is able to roll down

14 that track and then rotate back up so that this arm can

15 go like that or like that.

16      The second ground that we've identified for non --

17 we believe is ripe for noninfringement, does not require

18 claim construction, is this section here that's in pink

19 that I showed to you earlier.  I'll put it back up for

20 your consideration.  And that's this section that talks

21 about the apparatus being supported in a way such that

22 the auger conveyor can extend from a front corner portion

23 of the container.  And again, seeing the Kinze design --

24 and you've seen the J&M design now, and so I'm not going

25 to hold this up for too long with these images because

1  you just saw that, but I do want to put a couple up

2  really fast.  So these are images from the '598 patent.

3  Again, you can see what that looks like in the J&M

4  embodiment, and, specifically, what they show to the

5  public, how they drafted the application.

6      This is from the complaint, and this is how J&M has

7  alleged that that "from" limitation is satisfied by the

8  Kinze dual auger grain carts.  It's that there's this --

9  at this joint, the upper section attaches, and they say

10 that it is extending from the top corner portion of the

11 container.  Kinze does not believe it's coming from the

12 container portion because it's separate from the

13 container.  As you can see, it -- it emanates from that

14 grain transfer, which is at the front center, outside of

15 the container box itself.  And, again, here's another

16 view from the complaint where you can see where that

17 joint is located, and that's -- that's the position that

18 J&M has alleged you can see the "from," "coming from."

19 And Kinze points to use of the word "adjacent," not

20 seeking that the Court necessarily define "adjacent,"

21 define "from," construe those terms as you would in a

22 claim construction proceeding, but simply to show that

23 when something is wanted to describe as outside or

24 adjacent to or emanating from a different position, they

25 use the term "adjacent," and "from" is used in a

1  different manner, and that those claim terms, going back

2  to the public notice function, have different meaning,

3  and the public is capable of relying on those.

4      In summary, I want to point out again, we have two

5  distinct grounds here.  One is that J&M has taken

6  self-limiting actions to focus the claim scope of their

7  patent on the single corner auger style grain cart.  And

8  all of the accused products are of a different type of

9  dual auger grain cart design, and as such, do not fall

10  within the scope of the claims, and that should be a

11  basis to dismiss the case under the Rule 12(c) motion.

12      If the Court's not persuaded by that, we also have

13  these separate grounds of noninfringement that we believe

14  are ripe without the need for claim construction as to

15  the fact that the Kinze devices are not mounted as

16  required by the claims and that the corner auger does not

17  emanate from the upper front corner portion of the

18  container as required by the claims, and we would posit

19  that there's no claim construction required for that.

20      Thank you very much, Your Honor.  If you have any

21  questions, I'm happy to address them.

22          THE COURT:  I don't at this point, Mr. Kennedy,

23  but, thank you.

24      And I will hear now from J&M.

25          MR. BLACKBURN:  Thank you, Your Honor.  Is my

mic okay?

THE COURT: It is. Thank you.

MR. BLACKBURN: Okay. I'll try to be brief. I think this is considerably more simple than what we've just heard, but I do want to address one thing quickly. This "mounted on" argument, this is the first time I've heard it. The word "mounted" is not -- I just went and controlled-F through both their briefs, their opening and their reply. The word "mounted" is not in there. But if we -- you know, as we looked at that picture, it sure looks mounted to me. I'm not a mechanical engineer, but it's attached both to the auger -- I mean, the conveyor and the grain cart. In my view, that would be mounted, but I think that something like that is fair -- you know, that could be briefed at claim construction.

What this dispute really is about, Your Honor, is -- and I'd like -- there are several things that are undisputed. Well, I think it's undisputed that the inventive aspects here, or what separates us from the prior art, is this what they call the askewed control -- askewed flow control spout, Your Honor. That's the inventive aspect. It's also undisputed that our patent, the examples that it uses, are single auger grain carts. It's also beyond dispute that the claims don't have those words in them. There is no single or dual discussed in

1    the claim.  And ordinarily, when a patentee wants to
2    limit their invention, they would have put into the claim
3    a single auger grain cart.  We didn't do that.  And so
4    what Kinze is doing is they're trying to cobble a piece
5    from here, a piece from here, and a piece from here to
6    get to what is known as a prosecution disclaimer or
7    specification disclaimer, it's -- these references that
8    are incorporated.
9         I'm going to pull up my PowerPoint real quick.  And
10   so the standard for prosecution disclaimer -- and, again,
11   this is an argument that is in 99 percent of cases, and
12   almost all the cases cited in their brief decided at
13   claim construction, and not on a judgment -- motion for
14   judgment on the pleadings, although I'm not going to
15   dispute that Your Honor does have the authority to rule
16   that way.  It's just uncommon.  But the Federal Circuit's
17   binding case law says "This Court does not rely on the
18   prosecution history to construe the meaning of the claim
19   to be narrower than it would otherwise be unless the
20   patentee limited or surrendered claim scope through a
21   clear and unmistakable disavowal."  In other words, we
22   must have disavowed dual auger grain carts, and that's
23   just not what happened.  We did see our response to the
24   office action.  What we were not shown in Kinze's
25   presentation is what the office action actually said.

1    And this is paragraph 6 of the May final office action,

2    which is the final rejection in this case.  And what is

3    being discussed in this, this prior art, and what the

4    examiner is talking about is -- is including a remotely

5    controllable actuator for filling the flow control spout.

6    Nowhere in this, in paragraph 6, does it say the prior

7    art teaches a dual auger grain cart.  It's just not what

8    he was speaking of.  So when we go back to the response,

9    it all makes tons of sense.  In fact, we -- the

10   applicant, us, we completely agreed with the examiner's

11   statements in paragraph 6 -- again, which don't say

12   anything about dual auger grain carts -- of the office

13   action as to what the applicant's '546 patent shows and

14   does not show, because, again, these prior art

15   references, some of them are from us.  However, the

16   specific problem presented by the grain cart in the

17   patent family is the problem of completely filing --

18   filling a semitrailer from a single auger corner grain

19   cart.  And so they want to take that reference to single

20   auger grain cart and say, well, now you need to put that

21   in the claim because we've told the public that we are a

22   single auger grain cart.  But it's really actually no

23   different than the specification, which is, again, drawn

24   only -- only described single auger grain carts, but it

25   is black letter Federal Circuit law that you can't take

1  that limitation from the specification and put it into

2  the claims.  In fact, I believe it's Judge Bryson, he

3  described that as the cardinal sin of patent law.  And

4  again, this is clearly a claim construction issue.

5       So now I do want to talk about this "incorporated by

6  reference" argument for a moment.  So they've come up

7  with a pretty novel theory, which is that unrelated

8  patents -- in their opening brief, they refer to them as

9  a patent family.  They're not.  A patent family is when a

10 series of patents are originated from an original

11 prior -- priority document.  So if you take Your Honor's

12 invention from half an hour ago, this shaking truck, we

13 could file a patent application on that.  We could get

14 some claims and get a patent, and we could file what's

15 called a continuation, and I could get another patent on

16 that.  And from that original specification, I can get as

17 many patents as I want as long as I have, you know,

18 distinguishable inventions that I can claim.  That's a

19 patent family.  A broader definition of a patent family

20 would also then include like a German patent or things

21 that are foreign that derive from a single international

22 PCT application.  "Incorporating by reference" something

23 into the specification does not make it a patent family.

24 In fact, you can incorporate anything by reference --

25 sometimes you see journal articles or things like that,

```
 1  that say -- because they're supposed to show and teach,
 2  you know, how one to make and use the invention, and we
 3  did hear some arguments about that, but those are
 4  enablement and written description arguments, which have
 5  not been raised and are frankly not appropriate for a
 6  judgment on the pleadings.  So these are not a patent
 7  family.  And so why that's crucial is that so if -- if we
 8  are -- if we're getting Your Honor your ten patents from
 9  the same shaking cart application, things that I say in
10  the prosecution history or in the original specification
11  will apply usually -- not always, but usually --
12  throughout all of those patents because they're related.
13  They came from the same application.  You're just --
14  frankly, I think of it as it's all the same patent, just
15  new claims, because that's the only thing you're able to
16  do.  You can't add written description later after the
17  fact to your specification.
18      What they're asking the Court to do here is take
19  these five patents that are incorporated by reference,
20  only two of which are drawn to the single auger grain
21  cart patents, and say, "Well, that's a patent family,
22  and, therefore, things that are said in your
23  specification of those patents limits you in the same way
24  that it would in a real patent family."  But I didn't see
25  it in their brief, and I've looked, and I've not seen a
```

1 Federal Circuit or even a district court say do this,

2 what they're asking the Court to do.

3     Skip forward, I've covered some of that already.

4     Finally, Your Honor, you know, the big issue here is

5 this is premature. You know, they filed this as a

6 judgment on the pleadings. I don't think they'll dispute

7 that most of the time when you're doing this it's done

8 through claim construction. If we go through the *Markman*

9 process and the Court rules against us and says, "No,

10 J&M, I believe what they're saying. This is a dual auger

11 claim [sic] cart," that's going to be the end of this

12 case very likely. We would -- you know, we don't dispute

13 that they are a dual auger grain cart. We dispute

14 whether our -- we are limited to it. And if the Court

15 decides we are limit to it, well, then we basically have

16 to, you know, stipulate to noninfringement, Your Honor

17 enters a judgment, and then we head up to the Federal

18 Circuit. So -- and the thing why -- I think in this

19 particular case why it's really kind of premature is

20 we're sitting here in April. We've already -- an hour

21 ago we heard all of our technical tutorials, which are

22 part of the *Markman* process. Three days from now we will

23 be exchanging our claim terms and our evidence, our

24 extrinsic evidence, and possibly *Markman* expert reports,

25 and then depose those experts. 11 days later, the

 1   rebuttals are due.  And through this process, by early

 2   July, the parties will have fully briefed all of these

 3   claim construction issues, we'll have possibly experts,

 4   we'll cite all of the extrinsic evidence, none of which

 5   has been mustered thus far and exchanged, we'll cite all

 6   of the things patent, and we will argue about, you know,

 7   what these claim terms mean.  I think we're still right

 8   even without that, but this is ordinarily how it is done.

 9   And I think, again, if the Court goes against us on this,

10   I would much rather be able to take this up to the

11   Federal Circuit on a full record.  I wouldn't like to do

12   this on a judgment on the pleadings because it would be

13   an incomplete record.  We will not have mustered our

14   claim construction evidence, and it's possible that we

15   then come back down and then do it and then possibly go

16   back up, which I think defeats the judicial efficiency

17   argument.  We're three months out.  We'll very likely

18   have this thing completely resolved through the *Markman*

19   process.  And I think, frankly, once we do the *Markman*,

20   it will make infringement a lot clearer for both parties.

21        And, finally, just a little bit about this present

22   invention aspect, they -- every patent says this.  And if

23   our patent had said "The present invention is only

24   related to single auger grain carts," then I think J&M

25   would be in trouble, but our patents don't say that.  The

1  point of the present invention is the thing that we saw

2  in the technology tutorials.  It's an askewed flow

3  control port.  And we heard very little about that in the

4  argument on -- from Kinze.  They want to focus on all

5  this stuff that really isn't what was the focus of -- of

6  their briefing and really doesn't have a whole lot to do

7  with the patent.  The patent is agnostic as to whether it

8  has one, two, or a dozen augers.  The entire point is

9  that to any of these, you can attach our inventive flow

10  control spout.

11       And then just one point on the *Jepson* claim issue,

12  Your Honor.  I'm going to switch over to here so we can

13  see the patent.  So we're in agreement; it's a *Jepson*

14  claim.  It improves the, you know, the piece we're in.

15  And so if you -- in a *Jepson* claim, which is a very odd

16  claim.  They don't come up very often.  You describe kind

17  of what is the prior art and then say, "Our improvement

18  is on top of that."  Well, if you look through the claim,

19  the *Jepson* portion of the claim, nowhere does it say

20  single auger grain cart.  So if we had said "single auger

21  grain cart" in the preamble or any other part of the

22  initial *Jepson* portion of the claim, that would be a

23  problem for us, but we don't say that.  They're pulling

24  the single auger grain cart from, one, preferred

25  embodiments, which is totally impermissible under Federal

and Circuit case law, and from unrelated patents that
were incorporated for the purpose of having written
description support.

    And I just close with, you know, I totally agree
with counsel.  The purpose of a patent claim is to put
the public on notice of what you have claimed and what is
your property.  It's basically like a big fence and a no
trespassing sign.  And if you look at the claim, it just
has nothing to do with single or dual auger grain carts.
So one looking at this claim, without looking at the
specification, without looking at anything else, would
never think that this is just about a single auger grain
cart, because that's just not in the claim.

    So if Your Honor has any questions, I'd be happy to
answer them.

        THE COURT:  I don't at this point, but thank
you, Mr. Blackburn.

    Any, Mr. Kennedy, any response you want to make at
this point?

        MR. KENNEDY:  Yes, thank you, Your Honor,
briefly.  First, I do want to point out that there's a
difference between the scope of patent in the scope of
patent claims and a formal disclaimer.  There are
different types of -- or disavowals.  There are different
types of ways that you can disavow or leave out dedicated

1  portions of a disclosure to the public.  The discovery

2  disclosure -- or the Discovery Dedication Doctrine is one

3  of those.  But you also have patent claims that have

4  meaning based on the specification in the figures and the

5  things that are contained therein.  And it's appropriate

6  for the -- I mean, it's -- it's the law that you read

7  claims in light of what else is there.  It's not just

8  claims in a vacuum.  That's actually language used in the

9  case law.  It's not claims in a vacuum.  And I don't want

10  to go down the path too deeply of claim construction

11  because we're taking the position that claim construction

12  is not necessary to decide this at this time.  And if --

13  as I've said, candidly, if the Court believes claim

14  construction is necessary, then that's fine.  We're going

15  to continue with the process Mr. Blackburn shared, as the

16  parties are going to be doing some of that process anyway

17  this week.  But in the -- let me see here, I thought I

18  pulled this page out.  Maybe I pulled the wrong page out.

19  But the *Graham versus Deere* case and then the *Phillips* --

20  here we go, the *Phillips* case, both talk about how claims

21  are read in view of their prosecution -- in view of the

22  intrinsic record is what it's referred to as, and that is

23  the patent specification, the figures, and then the

24  examination history, because those inform what the

25  patentee understood the scope of the invention to be.

1    We don't -- we -- we dispute J&M's position as to

2  what the office action showed.  We showed the office

3  action that was cited as part of the briefing that we

4  filed.  But J&M did make representations to the examiner

5  in an effort to obtain an allowance of those claims,

6  characterizing those claims as being specific to a single

7  auger design.  And the scope of what was disclosed is

8  specific to a single auger design.  And I -- I point to

9  the -- you know, counsel raised a question and says the

10  claims don't talk about single auger, they don't talk

11  about dual auger.  It's true, the patent specification

12  doesn't describe single/dual auger in those exact words,

13  but what it does do is it shows all these figures and

14  walks through the disclosure of what the invention is

15  based on those figures.  And then in the claims, the pink

16  section that I had highlighted earlier, describes how

17  that single -- it doesn't say "single," but how the auger

18  conveyor is supported by the container and emanates from

19  a front corner portion of said container.  So, again,

20  while there can be -- maybe there's different

21  configurations that you can use, what they've shown in

22  the specification is consistent with what is in the

23  claim.  And understanding what this incline forward --

24  incline upwardly and forwardly and laterally outwardly

25  from a front corner portion of said container invokes

1　that single corner auger style, that is shown in images

2　and is referenced in the incorporated patents.

3　　　　One thing too I just -- I want to clear up, you

4　know, counsel is accurate in describing the formal aspect

5　of a patent family, where you have continuation patents

6　and divisional patents all related to the same priority

7　date. Kinze utilized, you know, as a -- I think just as

8　a way of characterizing to reduce the words, a

9　description of all of these as a patent family

10　informally, not to try to insinuate that they are part of

11　the same priority date, but because there's a series of

12　inventions that J&M had that kind of build upon each

13　other and continually cite each other in this

14　incorporation by reference. And that's -- those are the

15　patents that are disclosed at the first part of the

16　application and then later referenced in the summary of

17　invention. Thank you, Your Honor.

18　　　　　　THE COURT: Thank you.

19　　　　Mr. Blackburn, I want to give you the last chance.

20　Anything you want to add in response?

21　　　　　　MR. BLACKBURN: Sure. Just one quickly, and

22　it's up on there. And I heard counsel say that when we

23　were making these remarks, they're saying that this is

24　what the claims are drawn to. And if you look at what we

25　actually said, it says no such thing. It says, however,

1  the specific problem presented by the grain cart in the

2  patent is the problem of completely filling a

3  semitrailer, and then it goes on to say, from a single

4  corner cart.  Nothing that says my claims must be limited

5  to a single auger cart.  Thank you, Your Honor.

6          THE COURT:  Thank you.  Well, thank you,

7  counsel.  This is both educational and helpful for the

8  Court.  I will get a ruling out on this as soon as

9  possible.  In the meantime, we'll take it under

10  advisement, but I appreciate your argument here today and

11  the education.  Thank you.

12      (Proceedings concluded at 10:49 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

     I, Patrice A. Murray, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that at the time and place heretofore indicated, a hearing was held before the Honorable C.J. Williams; that I reported in shorthand and transcribed to the best of my ability the proceedings of said hearing; and that the foregoing transcript is a true record of all proceedings had on the taking of said hearing at the above time and place.

     I further certify that I am not related to or employed by any of the parties to this action, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

     IN WITNESS WHEREOF, I have set my hand this 23rd day of June, 2023.

/s/ Patrice A. Murray
Patrice A. Murray, CSR, RMR, FCRR
Court Reporter
PO Box 10541
Cedar Rapids, Iowa 52410

**'**

**'546** [2] - 50:10, 59:13
**'598** [7] - 19:8, 44:20, 45:12, 45:24, 46:10, 47:5, 55:2
**'757** [1] - 50:12
**'830** [4] - 45:18, 46:3, 46:4, 46:8
**'880** [1] - 43:11

**/**

**/s** [1] - 70:11

**1**

**1** [5] - 19:8, 38:15, 38:22, 50:10, 50:13
**1,000** [1] - 28:5
**1,100** [3] - 17:20, 28:16, 28:18
**1,100-bushel** [1] - 33:12
**1,156** [1] - 28:11
**1,300-bushel** [1] - 33:8
**1,400** [1] - 28:12
**1,400-bushel** [1] - 33:8
**1,500-bushel** [2] - 18:11, 33:8
**1,700-bushel** [1] - 33:9
**10** [2] - 20:6, 23:13
**10-minute** [1] - 23:25
**100-some** [1] - 28:10
**1000** [1] - 2:3
**102** [1] - 27:11
**10541** [2] - 1:24, 70:13
**10:49** [1] - 69:12
**10th** [1] - 1:15
**11** [3] - 28:20, 28:21, 62:25
**111** [1] - 1:15
**1121** [7] - 11:3, 21:1, 33:12, 53:13, 53:18, 53:24
**115** [1] - 2:6
**12(b)(6** [3] - 37:18, 37:20
**12(c** [8] - 37:10, 37:12, 37:17, 37:22, 38:12, 39:24, 39:25, 56:11
**12-row** [1] - 23:9
**1200** [1] - 2:6
**13** [1] - 15:16
**1321** [3] - 53:14, 53:15, 54:2
**1421** [3] - 9:11, 53:14, 54:9
**15** [3] - 13:5, 25:11, 30:11
**15-2** [1] - 32:1
**15-inch** [1] - 9:23
**15-width** [1] - 9:21
**1521** [1] - 53:14
**16** [5] - 17:12, 17:14, 22:25, 23:1, 31:24
**16-row** [1] - 23:7

**17** [2] - 17:12, 33:4
**1721** [3] - 53:14, 53:15, 54:2

**2**

**2** [4] - 9:6, 9:10, 23:9, 45:23
**2,500** [1] - 27:18
**2,700** [1] - 17:20
**2-minute** [1] - 18:12
**20** [2] - 24:21, 42:13
**2000** [1] - 51:6
**2023** [2] - 1:15, 70:10
**2172** [1] - 2:14
**22-CV-94** [2] - 1:6, 3:4
**222** [1] - 51:12
**23rd** [1] - 70:9
**2620** [1] - 2:4
**27-4** [1] - 50:1

**3**

**3** [3] - 12:12, 12:14, 46:4
**3,000** [1] - 23:9
**30** [2] - 24:21, 27:20
**30-inch** [3] - 9:22, 9:23, 9:25
**30-row** [1] - 9:22
**30-second** [1] - 22:1
**301** [1] - 21:25
**310-420** [1] - 10:19
**32,500** [1] - 27:20
**320** [1] - 23:11
**3200** [2] - 2:10, 2:12
**35,000** [1] - 27:14
**37** [1] - 43:22

**4**

**4** [1] - 42:13
**40-foot** [1] - 28:9
**410** [1] - 23:11
**420** [1] - 23:14
**43-foot** [1] - 28:11

**5**

**5** [1] - 52:15
**5,000** [1] - 23:7
**5/31/23** [1] - 1:21
**50** [1] - 14:21, 15:1
**50309** [2] - 2:10, 2:12
**5100** [1] - 2:3
**52361** [1] - 2:14
**52401** [1] - 2:7
**52410** [2] - 1:24, 70:13
**53** [2] - 27:12, 28:9
**56** [1] - 27:24

**6**

**6** [5] - 23:12, 23:25, 59:1, 59:6, 59:11
**6/23/23** [1] - 1:21
**60** [2] - 27:25, 28:2
**66-inch** [1] - 28:10

**7**

**7** [1] - 14:20
**7,000** [1] - 23:7
**700** [1] - 24:3
**750** [2] - 18:11, 24:3
**77002** [1] - 2:3
**77004** [1] - 2:5

**8**

**8** [2] - 19:6, 50:12
**80,000** [3] - 27:10, 28:3, 28:19
**80,000-pound** [3] - 24:12, 27:10, 28:4
**801** [2] - 2:10, 2:12
**850** [1] - 28:5
**8:56** [1] - 1:16

**9**

**9** [1] - 19:6
**90-degree** [1] - 15:14
**951** [1] - 51:12
**957** [1] - 51:12
**96** [1] - 28:9
**99** [1] - 58:11

**A**

**a.m** [2] - 1:16, 69:12
**ability** [4] - 28:14, 30:22, 38:10, 70:4
**able** [6] - 7:17, 7:18, 39:16, 54:13, 61:15, 63:10
**above-mentioned** [1] - 42:5
**absolutely** [1] - 38:21
**accurate** [1] - 68:4
**accused** [12] - 11:4, 18:20, 21:2, 29:7, 30:20, 30:21, 33:6, 33:7, 34:6, 34:10, 51:19, 56:8
**accusing** [1] - 40:17
**achieve** [3] - 20:12, 21:19, 49:8
**achieved** [1] - 21:10
**achieving** [2] - 20:14, 20:18
**action** [6] - 7:9, 38:18, 38:25, 45:3, 45:5, 48:13, 49:21, 49:24, 69:21

**59**:1, 59:13, 67:2, 67:3, 70:7, 70:8
**actions** [9] - 39:1, 39:5, 39:10, 40:3, 40:4, 40:5, 41:7, 51:15, 56:6
**active** [1] - 11:15
**actor** [1] - 5:5
**actuator** [1] - 59:5
**add** [4] - 35:18, 49:15, 61:16, 68:20
**added** [1] - 52:21
**address** [6] - 37:9, 37:10, 37:13, 37:22, 56:21, 57:5
**addressed** [3] - 39:3, 43:9, 50:7
**addressing** [1] - 36:25
**adjacent** [4] - 55:19, 55:20, 55:24, 55:25
**adjust** [2] - 6:19, 7:1
**administered** [2] - 38:16, 38:23
**admitted** [2] - 47:9, 47:25
**admitting** [1] - 46:22
**advantage** [2] - 16:23, 26:7
**advent** [2] - 13:8, 13:14
**advisement** [1] - 69:10
**affects** [2] - 27:4
**affirmed** [1] - 43:2
**affixed** [3] - 30:3, 32:5, 33:11
**agent** [3] - 39:15, 39:17, 39:22
**Agila** [1] - 39:13
**agnostic** [1] - 64:7
**ago** [5] - 14:21, 14:22, 15:1, 60:12, 62:21
**agree** [4] - 4:4, 36:8, 53:6, 65:4
**agreed** [1] - 59:10
**agreement** [2] - 47:12, 64:13
**agricultural** [1] - 24:9
**Agriculture** [1] - 27:22
**ahead** [6] - 3:7, 4:20, 5:19, 9:8, 22:3, 36:22
**air** [2] - 10:14, 13:3
**alleged** [3] - 53:18, 55:7, 55:18
**allow** [1] - 13:3
**allowance** [1] - 67:5
**allows** [5] - 6:5, 22:22, 23:19, 33:16, 35:6
**almost** [1] - 58:12
**aluminum** [3] - 27:16, 27:17, 27:20
**ambiguities** [1] - 48:25
**amend** [1] - 49:12
**amended** [4] - 32:1, 37:21, 49:11, 52:19
**amendments** [1] - 49:20
**amounts** [1] - 18:13
**analytical** [1] - 37:17
**AND** [1] - 1:11

**angle** [13] - 15:14, 17:11, 20:8, 20:12, 20:14, 20:16, 20:18, 21:10, 21:16, 36:2, 36:6, 53:24
**angled** [3] - 13:18, 16:2, 30:5
**angular** [1] - 17:4
**answer** [5] - 7:22, 37:10, 47:9, 65:15
**anyway** [1] - 66:16
**apart** [1] - 38:8
**apologize** [1] - 42:21
**apparatus** [4] - 12:20, 33:9, 45:10, 54:21
**apparatuses** [1] - 33:1
**APPEARANCES** [1] - 2:1
**appearing** [1] - 3:9
**applicant** [1] - 59:10
**applicant's** [1] - 59:13
**applicants** [1] - 43:23
**application** [16] - 39:6, 40:12, 41:17, 44:10, 48:14, 50:12, 50:13, 50:19, 52:3, 52:13, 55:5, 60:13, 60:22, 61:9, 61:13, 68:16
**applied** [1] - 42:24
**applies** [1] - 40:19
**apply** [3] - 49:18, 52:1, 61:11
**appreciate** [1] - 69:10
**appreciation** [1] - 8:13
**approach** [2] - 8:9, 8:10
**appropriate** [7] - 14:24, 37:13, 37:22, 38:13, 39:2, 61:5, 66:5
**April** [2] - 1:15, 62:20
**area** [15] - 14:1, 14:9, 16:5, 16:24, 18:2, 20:1, 21:20, 28:24, 28:25, 29:3, 30:7, 31:14, 31:21, 53:24
**argue** [2] - 35:20, 63:6
**arguing** [2] - 3:20, 4:5
**argument** [6] - 57:6, 58:11, 60:6, 63:17, 64:4, 69:10
**arguments** [3] - 41:4, 61:3, 61:4
**arm** [5] - 32:16, 32:17, 51:24, 54:5, 54:14
**art** [19] - 6:13, 7:5, 7:6, 7:18, 27:14, 35:9, 35:14, 47:25, 48:15, 48:17, 48:24, 49:1, 49:5, 57:20, 59:3, 59:7, 59:14, 64:17
**artful** [1] - 32:8
**articles** [1] - 60:25
**artwork** [1] - 46:14
**ascertaining** [1] - 51:10
**askewed** [6] - 6:3, 7:7, 42:6, 57:20, 57:21, 64:2
**aspect** [6] - 24:7, 26:13, 27:17, 57:22, 63:22, 68:4
**aspects** [2] - 24:8, 57:19
**assemblies** [1] - 14:7

**assembly** [9] - 14:11, 18:8, 32:15, 32:16, 33:10, 34:24, 34:25, 35:2
**asserted** [1] - 52:4
**assistant** [1] - 4:1
**associated** [5] - 11:18, 12:5, 19:24, 28:15, 30:20
**assume** [1] - 27:19
**attach** [1] - 64:9
**attached** [3] - 31:20, 33:2, 57:12
**attaches** [1] - 55:9
**attachment** [1] - 31:25
**attention** [4] - 42:14, 43:15, 46:17, 52:10
**Attenuators** [1] - 44:17
**ATTORNEY** [6] - 2:3, 2:4, 2:6, 2:10, 2:11, 2:13
**attorney** [1] - 70:8
**auger** [143] - 6:13, 11:5, 11:19, 11:20, 12:7, 13:23, 13:25, 14:1, 14:2, 14:6, 14:7, 15:2, 15:4, 15:5, 15:7, 15:9, 15:12, 15:18, 15:19, 15:20, 15:22, 16:6, 16:8, 16:13, 16:16, 16:25, 17:2, 17:3, 17:9, 17:15, 17:16, 17:17, 17:19, 17:24, 17:25, 18:3, 18:4, 18:7, 18:19, 18:23, 18:25, 19:2, 20:17, 28:23, 29:2, 29:6, 29:9, 29:11, 29:18, 29:19, 29:20, 29:22, 29:24, 30:2, 30:3, 30:4, 30:10, 30:13, 30:15, 30:17, 30:22, 30:25, 31:3, 31:4, 31:8, 32:3, 32:11, 32:13, 32:19, 32:22, 33:3, 33:15, 34:3, 34:4, 34:5, 34:7, 34:16, 35:1, 35:11, 40:8, 40:20, 41:2, 41:13, 41:20, 42:6, 44:22, 44:23, 45:23, 46:7, 48:11, 50:9, 50:16, 50:18, 51:17, 51:20, 51:21, 52:1, 52:11, 52:17, 52:24, 53:11, 53:21, 54:5, 54:22, 55:8, 56:7, 56:9, 56:16, 57:12, 57:23, 58:3, 58:22, 59:7, 59:12, 59:18, 59:20, 59:22, 59:24, 61:20, 62:10, 62:13, 63:24, 64:20, 64:24, 65:9, 65:12, 67:7, 67:8, 67:10, 67:11, 67:12, 67:17, 68:1, 69:5
**augers** [1] - 64:8
**authority** [1] - 58:15
**availability** [1] - 21:5
**available** [3] - 21:11, 26:18, 26:19
**Avenue** [4] - 1:15, 2:10, 2:12, 2:14
**average** [1] - 23:9
**axles** [1] - 13:10

**B**

**background** [3] - 40:25, 41:17, 45:20
**backwardly** [2] - 30:6, 34:9
**bang** [1] - 12:23
**bargain** [1] - 44:5
**base** [3] - 12:8, 12:11, 18:22
**based** [10] - 39:15, 43:4, 43:10, 43:21, 48:23, 48:24, 49:1, 52:1, 66:4, 67:15
**basic** [2] - 22:17, 53:10
**basis** [3] - 52:4, 53:7, 56:11
**beans** [4] - 24:15, 25:24, 26:1, 26:3
**became** [1] - 47:20
**become** [1] - 25:25
**bed** [1] - 36:4
**BEFORE** [1] - 1:13
**beginning** [1] - 50:11
**behalf** [1] - 3:9
**belabor** [1] - 51:14
**believes** [1] - 66:13
**Bergman** [1] - 2:6
**best** [2] - 4:10, 70:4
**better** [2] - 5:16, 19:22
**between** [7] - 10:2, 10:19, 15:19, 34:3, 50:2, 53:13, 65:22
**beyond** [4] - 24:8, 24:9, 42:11, 57:24
**big** [2] - 62:4, 65:7
**bin** [6] - 10:15, 23:3, 23:11, 23:12, 23:20, 23:23
**binding** [1] - 58:17
**bins** [2] - 13:2
**Biosig** [1] - 38:2
**bit** [13] - 5:11, 5:14, 8:20, 12:8, 12:10, 15:17, 18:17, 19:22, 22:3, 38:3, 38:20, 45:8, 63:21
**black** [3] - 33:13, 33:19, 59:25
**Blackburn** [6] - 3:11, 3:22, 35:16, 65:17, 66:15, 68:19
**BLACKBURN** [26] - 2:3, 3:11, 3:16, 3:19, 4:15, 4:21, 4:25, 5:15, 5:18, 5:21, 6:12, 6:18, 6:21, 6:23, 7:3, 7:12, 7:16, 7:21, 8:1, 35:19, 36:8, 36:13, 36:18, 56:25, 57:3, 68:21
**blow** [2] - 25:4, 25:5
**blue** [4] - 18:22, 19:3, 31:16
**board** [2] - 12:23, 12:24
**boilerplate** [2] - 42:14, 42:25
**boom** [1] - 20:5
**bottleneck** [1] - 24:18
**bottom** [5] - 10:10, 14:9, 16:4, 19:4, 19:10,

**box** [3] - 15:24, 18:2, 55:15
**Box** [1] - 1:24, 70:13
**bracket** [6] - 31:19, 31:20, 52:23, 53:17, 53:25, 54:4
**break** [2] - 25:9, 26:1
**brief** [12] - 41:15, 43:2, 44:17, 47:17, 50:2, 51:5, 51:13, 53:9, 57:3, 58:12, 60:8, 61:25
**briefed** [2] - 57:15, 63:2
**briefing** [4] - 39:12, 39:24, 64:6, 67:3
**briefly** [3] - 47:18, 52:8, 65:21
**briefs** [1] - 57:8
**bring** [1] - 25:20
**brittle** [1] - 25:25
**broader** [1] - 60:19
**broken** [1] - 25:5
**Bryson** [1] - 60:2
**build** [1] - 68:12
**building** [1] - 20:15
**bulk** [1] - 19:11
**burning** [1] - 22:10
**bushel** [3] - 27:24, 28:1, 28:2
**bushels** [12] - 10:19, 17:20, 18:11, 23:8, 23:9, 24:3, 28:5, 28:11, 28:12, 28:16, 28:18

**C**

**C.J** [2] - 1:13, 70:3
**call** [5] - 6:2, 22:6, 27:15, 27:16, 57:20
**called** [12] - 9:18, 9:19, 10:8, 10:9, 13:22, 16:4, 20:8, 47:18, 49:9, 49:10, 60:15
**cam** [1] - 32:20
**cancel** [1] - 49:17
**candidly** [1] - 66:13
**cannot** [1] - 13:4
**canvas** [3] - 21:14, 21:24
**capable** [1] - 56:3
**capacities** [4] - 17:18, 23:11, 28:8, 28:13
**capacity** [14] - 10:17, 10:19, 13:8, 13:11, 16:15, 16:17, 17:19, 17:21, 23:3, 23:23, 24:14, 28:11, 28:12, 33:7
**capture** [1] - 25:20
**cardinal** [1] - 60:3
**care** [1] - 4:12
**carriage** [1] - 12:15
**carry** [1] - 14:12
**carrying** [1] - 17:21
**cart** [88] - 5:23, 8:13, 11:3, 12:5, 12:21, 12:22, 12:24, 13:8, 13:11, 15:1, 15:2, 15:4, 15:13, 15:15, 15:18, 15:20, 15:22, 15:24, 16:4, 16:10,

16:15, 17:15, 17:17, 18:7, 18:14, 22:16, 23:18, 23:20, 23:21, 23:22, 23:23, 24:2, 26:12, 29:6, 29:9, 29:19, 30:4, 30:9, 30:10, 30:13, 32:22, 33:2, 33:9, 33:18, 33:23, 34:3, 34:4, 36:11, 38:16, 40:9, 41:19, 42:7, 44:22, 44:24, 45:23, 46:7, 48:11, 50:9, 50:17, 50:18, 51:17, 53:19, 53:20, 53:23, 56:7, 56:9, 57:13, 58:3, 59:7, 59:16, 59:19, 59:20, 59:22, 61:9, 61:21, 62:11, 62:13, 64:20, 64:21, 64:24, 65:13, 69:1, 69:4, 69:5

**carts** [33] - 11:18, 11:23, 12:7, 12:9, 12:11, 13:15, 15:21, 16:14, 16:16, 17:6, 17:19, 18:19, 21:2, 29:17, 29:18, 30:2, 30:3, 33:16, 34:6, 40:20, 41:2, 41:14, 51:20, 51:21, 52:1, 54:2, 55:8, 57:23, 58:22, 59:12, 59:24, 63:24, 65:9

**case** [34] - 3:3, 29:7, 30:22, 37:13, 37:16, 37:21, 38:3, 38:22, 39:4, 39:10, 39:13, 39:14, 39:16, 39:23, 39:24, 43:1, 43:6, 43:8, 44:16, 47:16, 47:21, 48:4, 51:1, 51:6, 53:8, 56:11, 58:17, 59:2, 62:12, 62:19, 65:1, 66:9, 66:19, 66:20

**cases** [5] - 37:19, 38:15, 39:25, 58:11, 58:12

**casing** [3] - 19:2, 32:11, 35:11

**caught** [1] - 46:17

**CEDAR** [1] - 1:2

**Cedar** [4] - 1:16, 1:24, 2:6, 70:13

**center** [9] - 17:1, 20:17, 20:18, 29:9, 30:6, 30:15, 31:9, 31:18, 55:14

**centered** [2] - 16:22

**certain** [2] - 11:25, 39:5

**certainly** [1] - 37:6

**Certified** [2] - 1:17, 70:2

**certify** [2] - 70:2, 70:6

**CFR** [1] - 43:22

**challenged** [1] - 43:12

**chamber** [1] - 10:8

**chance** [2] - 35:16, 68:19

**change** [4] - 8:24, 49:6, 49:20

**changes** [2] - 49:16, 49:18

**characterized** [1] - 49:24

**characterizing** [2] - 67:6, 68:8

**chat** [1] - 8:4

**chatted** [1] - 29:15

**chelating** [3] - 39:15, 39:17, 39:22

**chose** [1] - 49:12

**chosen** [1] - 45:17

**circled** [1] - 32:4

**Circuit** [10] - 43:2, 44:15, 44:18, 51:4, 51:6, 59:25, 62:1, 62:18, 63:11, 65:1

**Circuit's** [1] - 58:16

**cite** [4] - 39:25, 63:4, 63:5, 68:13

**cited** [11] - 39:13, 39:23, 43:2, 44:17, 47:16, 51:5, 51:13, 53:8, 54:3, 58:12, 67:3

**Civil** [1] - 38:14

**claim** [76] - 19:8, 28:24, 37:14, 37:15, 37:23, 38:4, 38:5, 38:8, 39:2, 39:16, 40:13, 41:3, 45:9, 46:11, 46:17, 46:18, 46:19, 46:20, 47:5, 47:10, 47:11, 47:12, 47:13, 47:19, 48:1, 48:3, 48:10, 49:17, 49:19, 49:20, 51:3, 52:5, 52:9, 53:5, 53:9, 54:18, 55:22, 56:1, 56:6, 56:14, 56:19, 57:15, 58:1, 58:2, 58:13, 58:18, 58:20, 59:21, 60:4, 60:18, 62:8, 62:11, 62:23, 63:3, 63:7, 63:14, 64:11, 64:14, 64:15, 64:16, 64:18, 64:19, 64:22, 65:5, 65:8, 65:10, 65:13, 66:10, 66:11, 66:13, 67:23

**Claimant** [1] - 1:8

**claimed** [6] - 42:4, 46:3, 48:2, 48:6, 51:12, 65:6

**claiming** [2] - 39:6, 50:23

**claims** [40] - 6:1, 37:24, 38:2, 38:7, 38:10, 42:9, 42:13, 43:1, 43:3, 43:7, 45:3, 48:20, 48:21, 48:23, 49:2, 49:3, 49:4, 49:12, 51:9, 53:11, 56:10, 56:16, 56:18, 57:24, 60:2, 60:14, 61:15, 65:23, 66:3, 66:7, 66:8, 66:9, 66:20, 67:5, 67:6, 67:10, 67:15, 68:24, 69:4

**clarify** [1] - 33:6

**classic** [1] - 12:14

**clause** [1] - 49:14

**cleaning** [2] - 10:14, 25:3

**clear** [10] - 9:5, 38:6, 40:6, 40:9, 40:12, 40:15, 52:5, 58:21, 68:3

**clearer** [1] - 63:20

**clearly** [3] - 9:2, 27:2, 60:4

**climb** [1] - 6:8

**close** [2] - 31:7, 65:4

**closer** [3] - 5:12, 5:14, 53:1

**CO** [1] - 1:13

**co** [5] - 3:13, 14:4, 19:17,

20:4, 24:16

**co-counsel** [1] - 3:13

**co-op** [4] - 14:4, 19:17, 20:4, 24:16

**cob** [1] - 14:16

**cobble** [1] - 58:4

**Code** [2] - 43:21, 48:19

**coffee** [3] - 46:15, 46:16, 46:17

**column** [4] - 42:13, 50:3

**combine** [28] - 9:11, 9:16, 10:7, 10:15, 10:16, 10:20, 22:8, 22:13, 22:14, 22:15, 22:18, 23:1, 23:3, 23:5, 23:7, 23:12, 23:17, 23:19, 24:1, 24:5, 25:3, 25:6, 25:9, 25:20, 28:18

**combine's** [1] - 22:9

**combines** [5] - 9:16, 22:20, 22:21, 23:6, 23:8

**coming** [6] - 32:17, 35:10, 36:19, 53:23, 55:11, 55:18

**commencing** [1] - 1:16

**commercial** [1] - 5:25

**commonly** [1] - 42:25

**community** [1] - 26:9

**compaction** [2] - 26:25, 27:3

**competitors** [1] - 51:9

**complaint** [6] - 32:1, 37:21, 52:18, 52:19, 55:6, 55:16

**Completed** [1] - 1:21

**completely** [5] - 50:8, 59:10, 59:17, 63:18, 69:2

**compositions** [1] - 48:16

**comprising** [1] - 47:3

**concaves** [2] - 10:10, 10:13

**concept** [1] - 22:18

**concerning** [1] - 51:8

**concluded** [2] - 26:15, 69:12

**conditions** [1] - 27:6

**conduct** [1] - 51:11

**configuration** [2] - 30:5, 33:23

**configurations** [1] - 67:21

**confined** [1] - 9:4

**confused** [1] - 34:15

**conjunction** [2] - 10:9, 41:8

**connected** [1] - 42:5

**connection** [1] - 31:2

**considerably** [1] - 57:4

**consideration** [2] - 39:9, 54:20

**considered** [3] - 37:19, 43:9, 49:19

**consistent** [5] - 40:6, 44:15, 44:18, 48:19, 67:22

**constant** [1] - 28:25

**constituted** [1] - 39:22

**constitutes** [1] - 51:7

**construction** [22] - 37:14, 37:15, 37:23, 38:8, 39:2,

39:17, 39:20, 52:5, 53:5, 54:18, 55:22, 56:14, 56:19, 57:15, 58:13, 60:4, 62:8, 63:3, 63:14, 66:10, 66:11, 66:14

**construe** [4] - 53:2, 53:3, 55:21, 58:18

**construed** [4] - 38:15, 38:23, 41:10, 51:4

**construing** [1] - 37:25

**contained** [1] - 66:5

**container** [31] - 15:24, 18:2, 18:5, 18:25, 29:11, 29:12, 29:20, 29:21, 29:23, 29:25, 30:4, 30:6, 30:16, 30:18, 30:19, 32:6, 34:8, 51:22, 52:12, 52:17, 52:25, 53:12, 54:23, 55:11, 55:12, 55:13, 55:15, 56:18, 67:18, 67:19, 67:25

**contemplated** [1] - 49:3

**contend** [1] - 35:8

**content** [1] - 13:6

**context** [1] - 48:2

**continually** [3] - 12:16, 12:18, 68:13

**continuation** [2] - 60:15, 68:5

**continue** [2] - 6:9, 66:15

**continues** [1] - 23:21

**continuous** [1] - 12:17

**contrary** [1] - 22:17

**control** [13] - 6:2, 6:3, 7:7, 7:14, 7:16, 24:9, 54:5, 57:20, 57:21, 59:5, 64:3, 64:10

**controllable** [1] - 59:5

**controlled** [1] - 57:8

**controlled-F** [1] - 57:8

**conveyor** [10] - 6:13, 14:11, 20:17, 41:20, 44:22, 52:12, 54:22, 57:12, 67:18

**copy** [1] - 52:18

**corn** [42] - 8:25, 9:4, 9:17, 9:18, 9:19, 9:20, 9:22, 9:25, 10:2, 10:3, 10:4, 12:14, 12:25, 13:1, 13:4, 13:16, 13:24, 14:2, 14:3, 14:10, 14:14, 14:24, 22:9, 22:23, 23:1, 23:2, 23:8, 23:9, 24:15, 24:20, 24:22, 25:12, 25:13, 25:14, 25:21, 27:23, 28:16, 28:18

**corn's** [1] - 22:10

**corner** [33] - 9:15, 17:5, 17:7, 17:8, 29:4, 29:12, 30:4, 30:8, 40:8, 40:20, 41:2, 41:13, 44:23, 45:23, 46:7, 48:11, 50:9, 50:16, 50:18, 51:17, 51:21, 52:16, 54:22, 55:10, 56:7, 56:16, 56:17, 59:18, 67:19, 67:25, 68:1, 69:4

**corners** [4] - 6:5, 6:9, 7:18, 36:7

**cornstalk** [1] - 25:18
**counsel** [11] - 2:13, 3:7, 3:13, 3:16, 4:8, 65:5, 67:9, 68:4, 68:22, 69:7, 70:8
**counterclaims** [1] - 47:10
**couple** [7] - 3:4, 5:7, 20:20, 31:13, 54:7, 55:1
**COURT** [43] - 1:1, 1:11, 3:2, 3:15, 3:18, 3:21, 4:3, 4:9, 4:19, 4:24, 5:9, 5:11, 5:13, 5:17, 6:17, 6:19, 6:22, 6:25, 7:10, 7:24, 8:2, 8:7, 8:21, 34:15, 34:21, 34:25, 35:4, 35:7, 35:15, 35:23, 36:12, 36:15, 36:20, 36:22, 37:2, 37:6, 38:19, 42:19, 56:22, 57:2, 65:16, 68:18, 69:6
**court** [7] - 3:1, 37:25, 38:16, 38:23, 39:16, 51:6, 62:1
**Court** [26] - 1:23, 3:5, 8:12, 37:9, 38:2, 40:1, 41:16, 43:15, 47:16, 47:17, 51:4, 52:15, 53:2, 53:3, 53:6, 55:20, 58:17, 61:18, 62:2, 62:9, 62:14, 63:9, 66:13, 69:8, 70:12
**Court's** [4] - 42:14, 52:10, 54:7, 56:12
**cover** [4] - 12:9, 15:4, 22:12, 35:21
**covered** [3] - 21:17, 35:9, 62:3
**covering** [1] - 3:10
**covers** [1] - 35:10
**Crawford** [1] - 2:4
**creates** [1] - 16:2
**crib** [1] - 14:13
**crooked** [1] - 41:24
**crop** [1] - 27:7
**crops** [1] - 26:5
**crucial** [1] - 61:7
**crystal** [1] - 9:5
**CSR** [2] - 1:23, 70:12
**cue** [1] - 47:8
**cued** [1] - 47:4
**Cumberland** [1] - 39:13

## D

**damage** [1] - 27:7
**date** [2] - 68:7, 68:11
**days** [5] - 26:17, 26:18, 26:19, 62:22, 62:25
**deal** [1] - 34:13
**decent** [1] - 26:17
**decide** [1] - 66:12
**decided** [1] - 58:12
**decides** [1] - 62:15
**dedicated** [1] - 65:25
**Dedication** [1] - 66:2
**deeply** [1] - 66:10

**Deere** [1] - 66:19
**defeated** [1] - 38:9
**defeats** [1] - 63:16
**Defendant** [1] - 1:5
**defendant's** [2] - 3:6, 39:23
**DEFENDANT'S** [1] - 1:12
**Defendant/Counter** [1] - 1:8
**defense** [2] - 3:23, 36:24
**define** [2] - 48:5, 55:20, 55:21
**defines** [1] - 48:1
**defining** [3] - 44:24, 46:20, 47:24
**definition** [1] - 60:19
**degree** [2] - 39:21, 51:11
**delighted** [1] - 34:13
**demonstrating** [1] - 20:16
**denotes** [1] - 47:1
**dense** [1] - 27:2
**Department** [5] - 12:6, 24:10, 24:11, 27:8, 27:22
**depict** [2] - 45:16, 45:25
**depicts** [1] - 5:25
**depose** [1] - 62:25
**depressions** [1] - 19:15
**derive** [1] - 48:1
**Des** [2] - 2:10, 2:12
**describe** [4] - 42:22, 55:23, 64:16, 67:12
**described** [4] - 42:12, 42:18, 59:24, 60:3
**describes** [4] - 41:19, 42:3, 45:10, 67:16
**describing** [1] - 68:4
**description** [6] - 40:11, 41:11, 61:4, 61:16, 65:3, 68:9
**design** [15] - 15:12, 16:21, 28:23, 29:8, 30:2, 38:11, 54:23, 54:24, 56:9, 67:7, 67:8
**designate** [1] - 52:21
**designed** [1] - 53:21
**designing** [1] - 51:11
**designs** [2] - 15:21, 44:24
**detail** [3] - 8:20, 12:9, 18:18
**details** [1] - 22:12
**deterioration** [1] - 25:1
**determination** [2] - 38:17, 38:25
**developed** [2] - 9:25, 15:2
**device** [6] - 46:6, 46:18, 46:21, 46:22, 53:14
**devices** [5] - 48:16, 51:19, 53:14, 53:15, 56:15
**difference** [5] - 34:2, 34:10, 50:2, 53:13, 65:22
**different** [18] - 8:9, 9:17, 29:25, 30:10, 30:14, 33:22, 40:24, 48:17, 48:22, 54:8, 55:24, 56:1, 56:2, 56:8, 59:23, 65:24, 67:20
**difficulty** [1] - 25:15

**digits** [1] - 45:19
**direct** [1] - 53:11
**directed** [6] - 15:10, 42:2, 50:5, 50:6, 50:15, 50:19
**direction** [4] - 6:20, 7:1, 34:17, 34:23
**directs** [2] - 34:17, 34:22
**disavow** [1] - 65:25
**disavowal** [1] - 58:21
**disavowals** [1] - 65:24
**disavowed** [1] - 58:22
**discharge** [36] - 11:20, 12:7, 13:20, 15:7, 15:12, 16:6, 16:25, 17:9, 18:4, 18:22, 19:2, 20:1, 20:3, 29:2, 29:10, 29:20, 29:22, 29:24, 30:3, 30:17, 30:22, 30:25, 31:2, 31:4, 31:8, 32:3, 32:9, 32:11, 32:13, 32:19, 33:14, 34:6, 34:17, 34:22, 42:6
**discharged** [1] - 13:20
**disclaimer** [7] - 42:9, 42:10, 43:6, 58:6, 58:7, 58:10, 65:23
**disclose** [1] - 41:7
**disclosed** [7] - 41:20, 42:4, 44:12, 44:22, 49:3, 67:7, 68:15
**disclosing** [2] - 40:22, 44:6
**disclosure** [7] - 43:4, 43:11, 44:20, 46:7, 66:1, 66:2, 67:14
**discovery** [1] - 66:1
**Discovery** [1] - 66:2
**discussed** [4] - 33:10, 41:15, 57:25, 59:3
**discussion** [2] - 9:1, 22:5
**dismiss** [2] - 39:15, 56:11
**disperse** [1] - 36:2
**dispute** [9] - 15:19, 47:11, 57:16, 57:24, 58:15, 62:6, 62:12, 62:13, 67:1
**disputes** [1] - 37:14
**distance** [1] - 52:25
**distinct** [2] - 46:18, 56:5
**distinctions** [1] - 51:23
**distinguishable** [1] - 60:18
**DISTRICT** [2] - 1:1, 1:1
**district** [1] - 62:1
**DIVISION** [1] - 1:2
**divisional** [1] - 68:6
**Doctrine** [1] - 66:2
**document** [2] - 50:1, 60:11
**done** [6] - 5:2, 5:3, 32:1, 36:7, 62:7, 63:8
**door** [3] - 13:20, 19:16, 20:5
**down** [38] - 6:1, 10:1, 10:5, 11:5, 11:16, 11:22, 12:2, 12:24, 13:5, 13:18, 13:19, 14:3, 14:12, 14:13, 14:14, 15:23, 16:7, 16:24, 17:24, 19:13, 19:25, 21:19, 22:14, 25:9, 26:22, 27:1, 29:1, 29:6,

32:23, 33:20, 35:6, 35:14, 36:4, 36:9, 38:19, 54:13, 63:15, 66:10
**downtime** [1] - 22:16
**downward** [2] - 6:16, 16:3
**downwardly** [2] - 19:19, 30:5
**dozen** [1] - 64:8
**drafted** [1] - 55:5
**drafting** [2] - 39:6, 52:3
**draw** [3] - 5:7, 43:15, 52:10
**drawing** [7] - 14:18, 16:11, 28:23, 30:7, 31:12, 31:19, 31:24
**drawings** [1] - 46:14
**drawn** [5] - 12:15, 13:12, 59:23, 61:20, 68:24
**dried** [3] - 13:5, 14:13, 14:14
**drive** [1] - 26:24
**drives** [1] - 26:8
**drop** [7] - 10:12, 10:13, 12:24, 14:3, 25:17, 25:22, 26:1
**drops** [3] - 20:5, 25:18, 25:23
**Dror** [1] - 47:16
**drum** [1] - 10:8
**dry** [3] - 19:11, 20:15, 25:13
**dryer** [1] - 13:1
**dual** [25] - 15:2, 15:4, 15:20, 17:15, 17:17, 17:19, 18:19, 29:19, 30:10, 30:13, 34:3, 34:5, 51:20, 52:1, 55:8, 56:9, 57:25, 58:22, 59:7, 59:12, 62:10, 62:13, 65:9, 67:11
**due** [1] - 63:1
**dump** [5] - 14:10, 14:12, 17:10, 19:17, 20:17
**dumping** [1] - 20:17
**during** [7] - 39:5, 39:6, 39:7, 48:13, 49:9, 49:11, 52:3
**dust** [2] - 11:9, 11:10

## E

**ear** [13] - 10:6, 10:11, 12:20, 12:21, 12:23, 12:25, 13:1, 13:16, 14:10, 25:17, 25:21, 25:22
**early** [5] - 24:22, 25:10, 26:3, 39:14, 63:1
**ears** [1] - 14:12
**easiest** [1] - 4:24
**eats** [1] - 8:15
**ECF** [2] - 32:1, 50:1
**educated** [1] - 4:20
**education** [1] - 69:11
**educational** [1] - 69:7
**effect** [1] - 20:11
**effectively** [1] - 44:19
**efficiency** [2] - 22:15,

22:17, 22:18, 23:5, 23:17, 24:5, 26:6, 26:11, 26:12, 38:13, 38:14, 63:16

**effort** [1] - 67:5
**eight** [1] - 26:19
**either** [2] - 9:3, 49:19
**elbow** [1] - 31:3
**elected** [1] - 40:13
**elements** [1] - 48:6
**elevated** [2] - 12:21, 14:9
**ELMO** [4] - 34:1, 37:4, 41:25, 45:14
**elongated** [1] - 33:20
**eloquent** [1] - 5:5
**emanate** [1] - 56:17
**emanates** [2] - 55:13, 67:18
**emanating** [1] - 55:24
**embodiment** [13] - 5:25, 40:23, 41:6, 41:7, 41:11, 42:12, 42:18, 42:23, 42:24, 43:4, 43:10, 52:13, 55:4
**embodiments** [3] - 42:17, 44:12, 64:25
**emergence** [1] - 27:4
**emerges** [3] - 18:25, 29:3, 30:8
**emerging** [2] - 29:11, 29:21
**emphasizing** [1] - 50:21
**employed** [5] - 38:16, 38:23, 48:1, 70:7, 70:8
**employee** [1] - 70:7
**employs** [1] - 37:17
**emptying** [1] - 23:20
**enablement** [2] - 40:11, 61:4
**enabling** [2] - 44:3, 44:25
**end** [2] - 6:14, 62:11
**ends** [1] - 9:17
**engineer** [1] - 57:11
**engineers** [1] - 20:8
**enters** [1] - 62:17
**entire** [3] - 35:1, 36:11, 64:8
**entirety** [5] - 30:24, 42:3, 44:10, 44:13, 44:14
**entitled** [1] - 51:9
**equal** [1] - 27:13
**equally** [1] - 40:19
**equipment** [2] - 26:23, 26:24
**essence** [1] - 22:11
**essentially** [15] - 10:3, 10:6, 11:19, 12:15, 13:2, 14:8, 16:25, 17:16, 22:25, 24:19, 24:20, 28:2, 28:13, 31:2, 32:18
**evaluate** [1] - 39:20
**evidence** [4] - 62:23, 62:24, 63:4, 63:14
**evolution** [1] - 7:13
**exact** [1] - 67:12
**examination** [10] - 39:19, 40:7, 43:19, 48:14, 49:9, 49:10, 49:11, 50:24, 52:3,

66:24

**examine** [1] - 43:20
**examiner** [7] - 41:4, 48:17, 49:24, 50:5, 50:17, 59:4, 67:4
**examiner's** [1] - 59:10
**examiners** [1] - 43:19
**Examining** [2] - 43:18, 43:25
**example** [8] - 15:22, 18:10, 19:10, 20:2, 23:6, 23:16, 28:8, 39:24
**examples** [2] - 40:20, 57:23
**exceed** [1] - 28:14
**exceeding** [1] - 28:19
**excessive** [1] - 24:23
**exchange** [1] - 44:7
**exchanged** [2] - 18:6, 63:5
**exchanging** [1] - 62:23
**excuse** [2] - 9:22, 41:24
**existed** [2] - 47:1, 49:8
**existence** [1] - 47:20
**expand** [1] - 40:18
**expands** [1] - 42:11
**experience** [1] - 8:22
**expert** [1] - 62:24
**experts** [2] - 62:25, 63:3
**explain** [1] - 5:22
**explaining** [4] - 44:2, 46:5, 46:6, 50:5
**explains** [1] - 5:4
**exponentially** [1] - 22:21
**extend** [4] - 31:8, 33:21, 52:25, 54:22
**extended** [2] - 11:10, 11:12
**extending** [2] - 13:9, 55:10
**extends** [2] - 31:6, 54:13
**extension** [2] - 26:14, 45:12
**extent** [1] - 13:10
**extrinsic** [2] - 62:24, 63:4

## F

**F.3d** [1] - 51:12
**faced** [2] - 49:11, 49:23
**facility** [2] - 14:3, 24:17
**fact** [9] - 8:25, 20:10, 43:1, 47:10, 56:15, 59:9, 60:2, 60:24, 61:17
**factor** [2] - 10:18, 23:4
**factors** [1] - 16:13
**factual** [1] - 71:4
**fair** [1] - 57:14
**fall** [1] - 56:9
**family** [11] - 59:17, 60:9, 60:19, 60:23, 61:7, 61:21, 61:24, 68:5, 68:9
**fan** [1] - 25:4
**fancy** [1] - 20:8
**far** [2] - 4:7, 63:5
**farm** [1] - 14:4
**farmer** [5] - 8:15, 12:18,

12:19, 14:22, 26:8, 31:6
**farmer's** [2] - 8:15, 24:8
**farmers** [2] - 25:12, 26:23
**farming** [2] - 8:22, 26:9
**fashion** [2] - 17:4, 31:4
**fast** [1] - 55:2
**FCRR** [1] - 1:23, 70:12
**feature** [3] - 30:20, 38:12, 54:3
**features** [1] - 31:13
**fed** [1] - 30:16
**Federal** [15] - 24:11, 38:14, 43:2, 43:21, 44:15, 44:18, 48:20, 51:4, 51:6, 58:16, 59:25, 62:1, 62:17, 63:11, 64:25
**federal** [1] - 38:22
**feeding** [1] - 16:24
**feet** [2] - 27:12, 28:9
**felt** [1] - 40:1
**fence** [1] - 65:7
**few** [1] - 39:4
**field** [12] - 11:14, 11:15, 11:23, 12:2, 14:24, 24:16, 25:13, 25:14, 26:18, 26:19
**fields** [3] - 11:24, 26:22, 26:25
**fifth** [1] - 33:5
**fig** [2] - 50:10, 50:12
**figure** [3] - 45:23, 46:4, 52:15
**figures** [5] - 45:15, 66:4, 66:23, 67:13, 67:15
**file** [3] - 48:14, 60:13, 60:14
**filed** [2] - 62:5, 67:4
**filing** [1] - 59:17
**fill** [2] - 6:5, 6:9
**filled** [3] - 36:10, 36:16
**filling** [5] - 5:23, 50:8, 59:5, 59:18, 69:2
**fills** [1] - 24:1
**final** [2] - 59:1, 59:2
**finally** [2] - 62:4, 63:21
**financially** [1] - 70:8
**finding** [1] - 43:3
**fine** [2] - 8:21, 66:14
**fines** [1] - 25:5
**finish** [1] - 21:21
**first** [14] - 4:11, 4:16, 4:17, 9:15, 26:16, 26:18, 34:20, 37:8, 37:23, 40:5, 51:25, 57:6, 65:21, 68:15
**fit** [1] - 41:25
**fits** [1] - 8:13
**five** [6] - 5:4, 18:20, 30:21, 34:6, 34:10, 61:19
**five-minute** [1] - 5:4
**fixed** [1] - 7:14
**flat** [1] - 33:24
**flip** [1] - 54:6
**floor** [7] - 15:5, 17:15, 17:24,

17:25, 18:3, 18:25, 29:24
**flooring** [1] - 13:18
**flow** [11] - 6:2, 6:3, 13:3, 14:2, 16:3, 16:7, 57:21, 59:5, 64:2, 64:9
**flows** [1] - 13:19
**focus** [3] - 56:6, 64:4, 64:5
**fold** [1] - 11:16
**folded** [3] - 15:7, 45:24, 45:25
**folding** [10] - 11:5, 45:3, 45:5, 45:10, 45:11, 45:16, 45:25, 46:2, 51:23
**folds** [3] - 11:22, 12:2, 32:12
**folks** [2] - 44:4, 44:25
**follow** [1] - 43:24
**following** [3] - 3:1, 27:5
**FOR** [5] - 1:1, 1:11, 1:12, 2:2, 2:9
**force** [1] - 41:25
**foregoing** [1] - 70:4
**foreign** [1] - 60:21
**form** [3] - 47:18, 48:1, 48:3
**formal** [2] - 65:23, 68:4
**formally** [1] - 37:25, 51:3
**format** [2] - 41:3, 48:10
**forth** [5] - 6:4, 6:16, 21:7, 35:12, 44:14
**forward** [4] - 15:6, 18:1, 62:3, 67:23
**forwardly** [2] - 30:8, 67:24
**four** [3] - 16:14, 18:20, 41:15
**fractures** [1] - 24:24
**framework** [2] - 21:12, 37:17
**frankly** [3] - 61:5, 61:14, 63:19
**free** [3] - 39:15, 39:17, 39:21
**front** [29] - 9:17, 11:19, 15:13, 16:1, 17:5, 17:6, 17:8, 18:5, 18:17, 18:18, 18:20, 19:18, 19:20, 19:23, 29:4, 30:18, 32:6, 32:22, 33:1, 33:14, 33:18, 33:23, 52:15, 52:24, 54:22, 55:14, 56:17, 67:19, 67:25
**full** [4] - 7:7, 13:10, 16:23, 63:11
**fully** [1] - 63:2
**function** [5] - 38:1, 38:4, 38:8, 51:2, 56:2
**functional** [1] - 22:7

## G

**GANNAMRAJ** [2] - 2:4, 3:14
**Gannamraj** [1] - 3:13
**gaps** [1] - 13:3
**gasketed** [2] - 31:1, 33:16
**general** [8] - 8:12, 16:18, 22:5, 23:13, 24:12, 27:13,

28:3, 30:2
**generally** [5] - 16:16, 16:17, 17:7, 17:18, 27:10
**gentleman** [1] - 6:8
**German** [1] - 60:20
**get** [19] - 5:11, 11:20, 13:8, 14:23, 17:24, 23:24, 24:1, 24:4, 27:17, 35:25, 44:5, 47:4, 52:8, 58:6, 60:13, 60:14, 60:15, 60:16, 69:8
**getting** [3] - 22:10, 44:7, 61:8
**give** [3] - 23:6, 35:16, 68:19
**given** [1] - 8:25
**gives** [1] - 43:19
**GLENN** [1] - 2:10
**Glenn** [1] - 3:24
**glove** [1] - 12:19
**goal** [3] - 25:11, 27:5
**Godfrey** [2] - 2:3, 3:12
**Gopal** [1] - 3:13
**GOPAL** [1] - 2:4
**grab** [1] - 10:5
**Graham** [1] - 66:19
**grain** [150] - 5:23, 5:24, 6:5, 7:17, 8:13, 9:2, 9:11, 9:12, 10:15, 11:1, 11:3, 11:15, 11:18, 11:23, 12:4, 12:7, 12:8, 12:10, 13:19, 13:23, 14:17, 15:1, 15:2, 15:4, 15:5, 15:11, 15:13, 15:14, 15:18, 15:20, 15:21, 15:22, 15:24, 15:25, 16:3, 16:7, 16:9, 16:13, 16:16, 16:24, 17:2, 17:4, 17:6, 17:15, 17:17, 17:19, 17:24, 17:25, 18:1, 18:2, 18:4, 18:6, 18:7, 18:13, 18:14, 18:19, 18:23, 19:1, 19:9, 20:5, 20:7, 20:10, 20:14, 20:16, 21:2, 21:4, 21:10, 21:15, 22:16, 23:10, 23:12, 23:18, 23:20, 23:21, 23:22, 23:23, 24:2, 25:1, 25:3, 26:12, 28:5, 29:1, 29:4, 29:6, 29:23, 30:15, 30:16, 30:17, 31:1, 31:10, 32:5, 32:22, 33:2, 33:9, 33:15, 33:18, 34:3, 34:4, 34:5, 34:18, 34:23, 35:25, 36:2, 40:8, 40:20, 41:2, 41:13, 41:18, 41:19, 42:7, 44:22, 44:24, 46:7, 50:17, 51:20, 53:19, 53:20, 53:23, 54:2, 55:8, 55:14, 56:7, 56:9, 57:13, 57:23, 58:3, 58:22, 59:7, 59:12, 59:16, 59:18, 59:20, 59:22, 59:24, 61:20, 62:13, 63:24, 64:20, 64:21, 64:24, 65:9, 65:12, 69:1
**grains** [4] - 9:3, 9:4, 9:17, 27:23
**Grand** [2] - 2:10, 2:12
**granular** [3] - 20:7, 20:9,
21:19
**grate** [1] - 20:4
**grates** [2] - 10:9, 10:13
**gravity** [10] - 13:15, 13:18, 13:19, 14:17, 16:3, 16:7, 16:24, 17:24, 20:5, 29:1
**gravity's** [1] - 20:11
**great** [1] - 5:18
**greener** [1] - 25:8
**Grimes** [1] - 4:7
**GRIMES** [1] - 2:13
**ground** [3] - 25:23, 35:22, 54:16
**grounds** [2] - 56:5, 56:13
**guess** [3] - 14:21, 33:6, 36:24
**guidance** [1] - 43:19
**guide** [1] - 43:22

## H

**haberdasher** [1] - 8:22
**Halberstadt** [1] - 51:5
**half** [4] - 26:16, 26:18, 32:10, 60:12
**halfway** [1] - 33:20
**hand** [9] - 9:15, 12:13, 13:1, 13:7, 13:12, 13:22, 15:23, 17:13, 18:16, 31:3, 31:21, 32:4, 35:11, 70:9
**handoff** [1] - 29:23
**hanging** [1] - 6:1
**happened** [1] - 58:23
**happens** [3] - 17:1, 36:3, 36:9
**happy** [4] - 7:22, 40:1, 56:21, 65:14
**harder** [2] - 25:8, 25:19
**harvest** [27] - 8:11, 8:14, 8:17, 8:20, 9:2, 10:18, 12:14, 12:17, 14:23, 22:5, 22:6, 22:8, 22:11, 23:10, 24:5, 24:7, 24:8, 24:22, 25:8, 25:10, 25:15, 25:21, 25:25, 26:5, 26:6, 26:11, 26:17
**harvested** [2] - 12:25, 24:21
**harvesting** [1] - 24:22
**haul** [1] - 24:15
**HDMI** [1] - 5:1
**head** [5] - 9:19, 10:4, 23:9, 25:20, 62:17
**heads** [2] - 9:18, 22:23
**healthy** [2] - 28:17
**heap** [2] - 28:11, 28:12
**hear** [6] - 5:10, 5:12, 36:24, 37:9, 56:24, 61:3
**heard** [5] - 57:5, 57:7, 62:21, 64:3, 68:22
**hearing** [7] - 3:5, 3:10, 4:12, 8:5, 70:3, 70:4, 70:5
**HEARING** [1] - 1:12
**heavy** [2] - 25:4, 26:24
**height** [1] - 53:1
**held** [3] - 3:1, 44:16, 70:3
**HELD** [1] - 1:13
**help** [1] - 14:22
**helpful** [2] - 40:2, 69:7
**helping** [1] - 4:2
**helps** [1] - 12:20
**hereby** [1] - 70:2
**hereto** [1] - 70:8
**heretofore** [1] - 70:3
**high** [1] - 28:10
**higher** [1] - 53:1
**highlighted** [7] - 17:16, 18:22, 31:16, 45:8, 47:6, 52:11, 67:16
**hinge** [1] - 33:16
**hinged** [2] - 31:1, 31:15
**historic** [4] - 12:14, 14:5, 15:12, 17:15
**historically** [3] - 9:25, 16:18, 17:18
**history** [9] - 12:13, 13:15, 39:19, 50:24, 50:25, 51:7, 58:18, 61:10, 66:24
**Hockerson** [1] - 51:5
**Hockerson-Halberstadt** [1] - 51:5
**hold** [1] - 54:25
**holds** [1] - 32:18
**HON** [1] - 1:13
**Honor** [48] - 3:11, 3:24, 4:7, 4:15, 4:21, 4:22, 7:21, 8:1, 8:3, 8:9, 8:17, 9:8, 9:9, 12:9, 13:18, 16:21, 19:7, 19:22, 20:21, 21:7, 22:4, 26:10, 30:22, 31:1, 33:5, 34:3, 34:12, 35:9, 35:19, 36:19, 37:1, 37:7, 37:16, 45:9, 50:4, 56:20, 56:25, 57:16, 57:21, 58:15, 61:8, 62:4, 62:16, 64:12, 65:14, 65:20, 68:17, 69:5
**Honor's** [1] - 60:11
**Honorable** [1] - 70:3
**hoop** [2] - 21:12, 21:15
**hopper** [10] - 19:12, 19:14, 20:3, 20:13, 21:3, 27:18, 27:20, 28:6, 28:7, 28:8
**hoppers** [2] - 19:12, 27:16
**horse** [2] - 10:1, 12:15
**horse-drawn** [1] - 12:15
**horsepower** [1] - 22:21
**horses** [1] - 12:15
**hour** [4] - 23:8, 23:10, 60:12, 62:20
**house** [2] - 2:13, 4:8
**Houston** [2] - 2:3, 2:5
**hump** [1] - 21:17

## I

**identified** [4] - 42:23, 52:22, 54:10, 54:16
**illegal** [1] - 28:6
**image** [3] - 52:18, 53:20, 54:6
**images** [5] - 45:15, 52:14, 54:25, 55:2, 68:1
**immediately** [1] - 19:25
**impact** [1] - 50:20
**impermissible** [1] - 64:25
**importance** [1] - 47:22
**important** [4] - 5:8, 8:10, 10:18, 12:17
**improved** [1] - 46:16
**improvement** [9] - 46:19, 46:22, 46:25, 47:2, 47:3, 47:7, 47:14, 47:24, 64:17
**improvements** [1] - 47:19
**improves** [1] - 64:14
**IN** [2] - 1:1, 70:9
**in-house** [2] - 2:13, 4:8
**INC** [2] - 1:4, 1:7
**inches** [2] - 27:12, 28:9
**incline** [2] - 67:23, 67:24
**include** [1] - 60:20
**including** [1] - 59:4
**incomplete** [1] - 63:13
**inconsistent** [1] - 44:13
**incorporate** [2] - 44:1, 60:24
**incorporated** [14] - 40:10, 41:22, 42:8, 44:9, 44:11, 44:19, 45:21, 50:11, 50:14, 58:8, 60:5, 61:19, 65:2, 68:2
**incorporating** [1] - 60:22
**incorporation** [6] - 40:23, 43:14, 43:16, 48:9, 50:23, 68:14
**increase** [1] - 25:16
**increasing** [1] - 13:11
**indicated** [1] - 70:3
**indicates** [1] - 48:4
**indicative** [1] - 41:6
**inexpensive** [2] - 38:17, 38:24
**inflow** [1] - 14:1
**inform** [1] - 66:24
**informally** [1] - 68:10
**information** [1] - 2:12
**infringement** [2] - 40:18, 63:20
**initial** [1] - 64:22
**inside** [2] - 10:7, 29:25
**insinuate** [1] - 68:10
**instance** [1] - 17:5
**instead** [2] - 45:17, 53:12
**Instruments** [1] - 38:3
**intention** [1] - 48:4
**interested** [1] - 70:8

**interesting** [3] - 9:24, 10:16, 45:2
**interior** [1] - 16:1
**international** [1] - 60:21
**intrinsic** [1] - 66:22
**introduce** [1] - 3:7
**invented** [1] - 41:14
**invention** [34] - 40:22, 41:1, 41:5, 41:9, 41:10, 41:17, 41:18, 42:1, 42:2, 43:4, 43:5, 43:10, 44:2, 44:3, 46:5, 46:15, 46:23, 46:24, 48:2, 48:6, 48:8, 49:24, 50:5, 50:22, 51:12, 58:2, 60:12, 61:2, 63:22, 63:23, 64:1, 66:25, 67:14, 68:17
**inventions** [1] - 41:9, 60:18, 68:12
**inventive** [4] - 7:16, 57:19, 57:22, 64:9
**inventors** [1] - 41:14
**invokes** [1] - 67:25
**involved** [2] - 8:17, 9:2
**inwardly** [1] - 16:2
**IOWA** [1] - 1:1
**Iowa** [12] - 1:16, 1:24, 2:7, 2:10, 2:12, 2:14, 8:25, 9:24, 24:10, 27:9, 70:2, 70:13
**issue** [8] - 24:18, 26:25, 35:10, 52:16, 60:4, 62:4, 64:11
**issues** [3] - 27:3, 39:2, 63:3
**itself** [5] - 10:16, 32:12, 36:1, 48:3, 55:15

## J

**J&M** [41] - 1:4, 2:2, 3:2, 3:12, 20:23, 28:23, 29:9, 29:17, 34:4, 40:4, 41:11, 42:1, 42:9, 44:20, 45:17, 46:6, 46:9, 47:8, 48:13, 49:11, 49:12, 49:21, 50:4, 50:15, 51:16, 51:25, 52:2, 52:13, 52:22, 53:18, 54:3, 54:24, 55:3, 55:6, 55:18, 56:5, 56:24, 62:10, 63:24, 67:4, 68:12
**J&M's** [2] - 8:10, 67:1
**J-E-P-S-O-N** [1] - 46:12
**Jay** [1] - 4:7
**JAY** [1] - 2:13
**Jepson** [22] - 40:13, 41:3, 46:11, 46:15, 46:17, 46:19, 46:20, 47:5, 47:10, 47:12, 47:18, 47:20, 47:21, 48:10, 50:22, 64:11, 64:13, 64:15, 64:19, 64:22
**Jepson-style** [2] - 40:13, 50:22
**job** [1] - 36:20
**jobs** [1] - 16:17

**JOHNSON** [14] - 2:10, 3:24, 4:4, 8:3, 8:8, 8:23, 10:25, 21:1, 21:24, 34:19, 34:24, 35:2, 35:5, 35:8
**Johnson** [2] - 3:25, 53:15
**joint** [3] - 31:15, 32:11, 55:9, 55:17
**Jon** [4] - 14:22, 14:25, 15:1, 53:20
**Jonathan** [1] - 4:5
**JONATHAN** [1] - 2:11
**journal** [1] - 60:25
**judge** [1] - 31:23
**Judge** [10] - 20:6, 23:16, 31:12, 32:7, 33:13, 60:2
**judgment** [9] - 3:6, 35:21, 36:23, 58:13, 58:14, 61:6, 62:6, 62:17, 63:12
**JUDGMENT** [1] - 1:12
**judicial** [2] - 38:13, 63:16
**July** [1] - 63:2
**jumbo** [1] - 11:21
**jump** [2] - 22:3, 28:20
**June** [1] - 70:10

## K

**keep** [4] - 3:8, 22:8, 22:13, 22:18
**KENNEDY** [7] - 2:11, 37:1, 37:3, 37:7, 38:21, 42:21, 65:20
**Kennedy** [4] - 4:5, 36:25, 56:22, 65:18
**kennedy** [1] - 37:2
**kernel** [2] - 24:24, 25:5
**kernels** [3] - 10:11, 10:12, 14:15
**key** [7] - 22:7, 22:12, 26:5, 30:20, 33:25, 34:2, 47:8
**kill** [1] - 22:3
**kind** [26] - 5:22, 6:4, 6:7, 6:16, 7:6, 7:8, 7:12, 7:14, 9:23, 10:22, 11:21, 13:6, 14:4, 14:18, 22:4, 22:17, 26:4, 27:8, 28:20, 32:9, 41:25, 44:4, 54:6, 62:19, 64:16, 68:12
**Kinze** [27] - 2:13, 3:3, 3:25, 4:8, 9:11, 18:10, 18:19, 18:21, 29:6, 30:1, 30:13, 34:3, 34:16, 34:22, 51:20, 53:10, 53:13, 53:19, 53:20, 54:23, 55:8, 55:11, 55:19, 56:15, 58:4, 64:4, 68:7
**KINZE** [1] - 1:7, 2:9
**Kinze's** [4] - 40:17, 47:9, 51:19, 58:24
**Kinzenbaw** [4] - 14:22, 14:25, 15:2, 53:20
**knocks** [1] - 10:10

**known** [1] - 58:6

## L

**labeled** [1] - 32:13
**labels** [1] - 52:21
**laboring** [1] - 15:21
**lack** [1] - 22:16
**language** [15] - 40:22, 41:5, 43:5, 43:11, 47:2, 48:25, 49:14, 49:17, 52:9, 66:8
**Larbi** [1] - 4:1
**Larbi-Siaw** [1] - 4:1
**large** [4] - 9:4, 10:8, 23:2, 25:4
**largely** [1] - 43:18
**larger** [8] - 17:17, 17:20, 17:21, 18:21, 22:20, 23:7, 33:16
**last** [3] - 26:16, 45:19, 68:19
**laterally** [1] - 67:24
**Laughter** [1] - 36:21
**lavaliere** [1] - 42:20
**law** [7] - 53:8, 58:17, 59:25, 60:3, 65:1, 66:6, 66:9
**lawful** [1] - 51:11
**lay** [1] - 46:20
**layout** [1] - 50:3
**lays** [1] - 46:23
**leading** [1] - 47:23
**leans** [1] - 25:19
**leave** [2] - 25:14, 65:25
**leaves** [1] - 10:11
**lectern** [1] - 8:4
**LEE** [1] - 2:11
**left** [16] - 4:2, 9:10, 9:15, 12:13, 13:22, 15:23, 16:21, 17:5, 17:8, 17:13, 29:4, 29:11, 29:18, 31:18, 35:11, 39:21
**left-hand** [6] - 9:15, 12:13, 13:22, 15:23, 17:13, 35:11
**legal** [4] - 4:1, 11:24, 28:14
**legally** [1] - 12:1
**length** [2] - 1:6, 27:12
**less** [2] - 25:12, 32:7
**letter** [1] - 59:25
**lettering** [1] - 52:20
**level** [2] - 24:21, 25:12
**levels** [1] - 17:19
**light** [3] - 39:18, 39:19, 66:7
**likely** [2] - 62:12, 63:17
**limit** [6] - 24:13, 28:14, 40:4, 51:16, 58:2, 62:15
**limitation** [5] - 11:18, 28:4, 37:11, 55:7, 60:1
**limitations** [5] - 12:1, 12:5, 29:8, 52:2, 55:6
**limited** [10] - 10:17, 40:7, 41:10, 43:3, 44:7, 44:12, 46:10, 58:20, 66:19, 66:9

**limiting** [2] - 23:3, 56:6
**limits** [2] - 12:6, 61:23
**line** [3] - 17:10, 30:7, 42:13
**lineage** [1] - 41:12
**Lisa** [5] - 3:25, 9:6, 10:21, 12:11, 21:8
**listed** [1] - 45:20
**literally** [1] - 49:16
**litigation** [1] - 9:3
**LLP** [1] - 2:3
**load** [2] - 21:18, 27:10
**loaded** [3] - 21:9, 21:15, 36:5
**loading** [1] - 18:8
**local** [1] - 3:16
**located** [2] - 18:4, 55:17
**location** [1] - 16:23
**locking** [1] - 5:1
**lodging** [2] - 25:17, 25:18
**look** [9] - 6:13, 19:23, 26:20, 45:12, 47:6, 48:20, 64:18, 65:8, 68:24
**looked** [1] - 57:10, 61:25
**looking** [8] - 5:23, 15:23, 19:13, 39:14, 45:6, 65:10, 65:11
**looks** [3] - 52:14, 55:3, 57:11
**losing** [1] - 25:6
**loss** [2] - 25:17, 26:2
**Louisiana** [1] - 2:3
**love** [1] - 46:16
**lower** [12] - 9:12, 19:4, 29:10, 29:22, 31:16, 31:17, 32:2, 32:3, 32:10, 33:2, 54:10
**lowered** [1] - 11:5

## M

**machine** [1] - 1:18
**made** [5] - 14:8, 39:8, 40:15, 41:3, 49:20
**maintain** [1] - 11:25
**make** [13] - 9:4, 23:4, 28:3, 39:8, 44:4, 44:25, 48:18, 48:21, 60:23, 61:2, 63:20, 65:18, 67:4
**makes** [4] - 4:11, 4:19, 59:9
**making** [3] - 27:2, 40:19, 68:23
**manner** [2] - 12:4, 56:1
**Manual** [2] - 43:17, 43:24
**manufacturer's** [1] - 24:9
**MANUFACTURING** [4] - 1:4, 1:7, 2:2, 2:9
**Manufacturing** [6] - 2:14, 3:3, 3:12, 3:25, 4:8
**mark** [1] - 31:6
**Markman** [5] - 62:8, 62:22, 62:24, 63:18, 63:19
**mated** [1] - 18:3
**material** [3] - 20:7, 20:10,

21:19
matter [2] - 3:2, 51:25
maturity [1] - 24:19
maximize [1] - 26:7
maximum [3] - 27:10, 27:11, 27:12
McKee [2] - 2:10, 2:11
mean [3] - 57:12, 63:7, 66:6
meaning [11] - 37:24, 38:1, 38:7, 38:10, 39:18, 51:9, 53:10, 56:2, 58:18, 66:4
meanings [1] - 51:3
means [1] - 40:14
meantime [1] - 69:9
mechanical [1] - 57:11
mechanically [5] - 15:6, 16:9, 16:25, 17:25, 18:7
mechanism [3] - 21:4, 37:13, 46:1
medical [1] - 48:16
medium [1] - 9:1
meet [1] - 28:3
mentioned [3] - 32:15, 42:5, 46:9
metal [5] - 10:9, 12:19, 14:8, 14:11
mic [1] - 57:1
microphone [2] - 5:13, 42:20
middle [1] - 18:24
mind [5] - 4:22, 9:7, 31:3, 33:4, 45:2
minority [1] - 17:6
minute [4] - 5:4, 18:11, 24:3, 24:20
minutes [1] - 23:13
missed [1] - 34:19
misses [1] - 31:6
missing [1] - 35:24
mixed [1] - 49:5
mobility [1] - 35:13
model [2] - 21:1, 33:12
models [3] - 18:20, 18:21, 30:21
modify [1] - 49:7
Moines [2] - 2:10, 2:12
moist [1] - 24:23
moisture [4] - 13:5, 24:21, 25:12, 26:21
moment [2] - 41:23, 60:6
monopoly [1] - 44:7
months [1] - 63:17
morning [3] - 3:14, 3:15, 3:24
most [3] - 5:3, 43:21, 62:7
MOTION [1] - 1:12
motion [16] - 3:6, 4:6, 4:12, 4:17, 35:20, 36:23, 36:24, 37:18, 37:20, 38:12, 39:14, 52:4, 53:5, 56:11, 58:13
motions [1] - 37:18
mound [1] - 20:11

mount [2] - 53:11, 53:16
mounted [13] - 52:12, 52:17, 52:22, 53:2, 53:4, 53:18, 54:3, 56:15, 57:6, 57:7, 57:9, 57:11, 57:13
mounting [2] - 53:16, 53:17
mouth [6] - 16:6, 16:8, 16:24, 18:4, 29:24, 30:16
move [10] - 6:16, 13:14, 14:3, 17:2, 17:3, 21:18, 30:23, 33:21, 34:8, 36:23
moveable [1] - 34:7
moved [4] - 12:1, 15:6, 16:9, 18:7
movement [10] - 12:17, 14:25, 45:4, 45:10, 45:11, 45:12, 45:16, 46:1, 46:2, 54:5
moves [5] - 6:4, 17:25, 18:1, 34:17, 34:25
moving [7] - 12:16, 12:18, 13:7, 22:8, 30:24, 30:25, 40:3
Moyer [1] - 2:6
MPEP [4] - 44:8, 44:13, 44:19, 48:19
MR [44] - 3:11, 3:16, 3:19, 3:24, 4:4, 4:15, 4:21, 4:25, 5:15, 5:18, 5:21, 6:12, 6:18, 6:21, 6:23, 7:3, 7:12, 7:16, 7:21, 8:1, 8:3, 8:8, 8:23, 10:25, 21:1, 21:24, 34:19, 34:24, 35:2, 35:5, 35:8, 35:19, 36:8, 36:13, 36:18, 37:1, 37:3, 37:7, 38:21, 42:21, 56:25, 57:3, 65:20, 68:21
mud [1] - 26:21
mumbo [1] - 11:21
Murray [5] - 1:17, 1:23, 70:2, 70:11, 70:12
must [2] - 58:22, 69:4
mustered [2] - 63:5, 63:13

## N

name [1] - 48:17
named [1] - 47:20
narrow [1] - 9:22
narrow-row [1] - 9:22
narrower [1] - 58:19
nature [1] - 16:18
Nautilus [3] - 38:2, 51:1
necessarily [2] - 46:2, 55:20
necessary [2] - 66:12, 66:14
need [13] - 23:4, 34:7, 37:15, 37:25, 38:5, 38:15, 39:3, 39:20, 52:5, 53:2, 53:5, 56:14, 59:20
needs [3] - 23:22, 34:7, 53:3
negatively [1] - 27:4
negatives [2] - 25:7, 25:10
never [2] - 9:7, 65:12

new [5] - 44:6, 49:14, 49:19, 61:15
next [15] - 7:5, 7:13, 13:8, 13:13, 13:14, 13:21, 19:21, 21:13, 21:21, 21:22, 29:5, 29:14, 29:16, 30:12
nice [1] - 7:9
nine [2] - 26:17
non [2] - 40:20, 54:16
non-single [1] - 40:20
none [1] - 63:4
noninfringement [5] - 37:11, 52:6, 54:17, 56:13, 62:16
NORTHERN [1] - 1:1
note [1] - 13:17
nothing [2] - 65:9, 69:4
notice [21] - 12:21, 15:25, 16:20, 19:14, 19:18, 19:23, 20:13, 21:5, 21:12, 23:17, 29:2, 29:8, 32:4, 33:13, 33:19, 38:1, 38:3, 38:8, 51:2, 56:2, 65:6
novel [2] - 49:2, 60:7
November [1] - 26:18
nowhere [2] - 59:6, 64:19
number [10] - 3:3, 14:20, 24:10, 24:25, 25:2, 26:23, 40:5, 45:19, 50:12

## O

obtain [2] - 40:16, 67:5
obvious [3] - 49:4, 49:7
obviously [4] - 4:16, 15:19, 21:17, 39:1
occurred [1] - 39:10
October [2] - 26:15, 26:16
odd [1] - 64:15
OF [1] - 1:1
office [11] - 40:16, 43:23, 49:21, 49:23, 58:24, 58:25, 59:1, 59:12, 67:2
offload [2] - 11:12, 18:11, 18:12, 22:14, 23:21, 23:22
offloaded [2] - 13:12, 23:20
offloading [12] - 9:11, 11:1, 11:7, 11:15, 20:13, 21:3, 21:4, 23:4, 23:12, 24:3, 28:5, 31:10
often [2] - 42:16, 64:16
oftentimes [1] - 19:11
Ohio [1] - 26:14
old [7] - 13:6, 13:11, 14:4, 35:9, 35:14, 53:19, 53:20
ON [2] - 1:12, 1:12
once [1] - 30:8, 63:19
one [43] - 3:4, 4:18, 5:1, 5:24, 6:3, 6:12, 7:4, 7:7, 7:14, 11:3, 15:3, 16:13, 17:2, 18:9, 19:21, 21:2, 21:22, 23:15, 24:10, 24:25, 26:8, 26:23,

29:5, 29:14, 29:16, 30:12, 45:2, 45:17, 45:20, 50:10, 50:20, 52:10, 56:5, 57:5, 61:2, 64:8, 64:11, 64:24, 65:10, 66:2, 68:3, 68:21
op [4] - 14:4, 19:17, 20:4, 24:16
open [8] - 3:1, 11:13, 13:25, 19:9, 19:10, 20:4, 26:1, 38:7
opened [1] - 15:9
opening [4] - 44:17, 51:13, 57:8, 60:8
opens [1] - 15:14
operate [2] - 4:23, 11:23
operates [1] - 10:9
operation [1] - 31:14
operator [1] - 6:19
opinion [1] - 51:6
opportunity [1] - 25:1
opposite [1] - 12:22
optimize [1] - 27:6
optimum [3] - 25:11, 26:4, 26:7
option [1] - 49:15
order [4] - 4:13, 4:14, 12:1, 40:16
Ordered [1] - 1:21
ordinarily [2] - 58:1, 63:8
original [4] - 49:17, 60:10, 60:16, 61:10
originally [1] - 53:21
originated [1] - 60:10
otherwise [8] - 8:19, 58:19
outside [8] - 18:1, 18:5, 30:16, 30:18, 32:6, 51:22, 55:14, 55:23
outwardly [6] - 29:3, 29:12, 30:8, 31:17, 34:9, 67:24
overall [1] - 8:14
overhead [4] - 15:23, 16:20, 17:14, 19:13

## P

page [2] - 66:18
PAMurrayReporting@ gmail.com [1] - 1:25
paragraph [6] - 42:3, 43:6, 50:13, 59:1, 59:6, 59:11
parallel [4] - 15:13, 32:22, 33:17, 52:24
pardon [1] - 29:21
part [18] - 6:1, 8:11, 22:4, 22:5, 24:5, 26:16, 29:10, 29:22, 30:25, 34:20, 38:1, 44:20, 48:5, 62:22, 64:21, 67:3, 68:10, 68:15
particular [18] - 11:3, 14:11, 15:12, 16:5, 17:11, 18:16, 19:8, 20:12, 31:12, 32:14,

42:17, 46:18, 46:25, 49:25, 51:18, 52:9, 62:19
**particularly** [1] - 20:22
**parties** [9] - 38:14, 38:16, 38:24, 47:12, 63:2, 63:20, 66:16, 70:7, 70:8
**parties'** [1] - 51:18
**partner** [1] - 4:5
**pass** [2] - 18:14, 23:2
**passing** [1] - 18:13
**past** [1] - 5:3
**Patent** [2] - 43:18, 43:24
**patent** [90] - 5:25, 19:8, 34:4, 35:9, 35:10, 36:18, 37:12, 37:13, 37:19, 38:4, 38:5, 39:6, 39:7, 39:8, 39:18, 40:4, 40:7, 40:12, 40:15, 40:16, 41:9, 42:10, 42:15, 43:9, 43:12, 43:19, 43:20, 43:23, 44:5, 44:9, 44:20, 45:13, 45:18, 45:19, 45:22, 45:24, 46:3, 46:4, 46:8, 46:10, 46:13, 47:5, 48:14, 48:18, 49:23, 50:3, 50:4, 50:10, 50:12, 50:19, 50:24, 52:1, 52:3, 52:13, 52:16, 55:2, 56:7, 57:22, 59:13, 59:17, 60:3, 60:9, 60:13, 60:14, 60:15, 60:19, 60:20, 60:23, 61:6, 61:14, 61:21, 61:24, 63:6, 63:22, 63:23, 64:7, 64:13, 65:5, 65:22, 65:23, 66:3, 66:23, 67:11, 68:5, 68:9, 69:2
**patented** [1] - 46:23
**patentee** [5] - 39:5, 40:3, 58:1, 58:20, 66:25
**patentee's** [1] - 51:8
**patents** [36] - 38:11, 40:10, 40:24, 41:1, 41:12, 41:13, 41:15, 41:20, 41:21, 42:5, 42:7, 42:25, 43:8, 43:12, 44:19, 44:21, 45:18, 45:20, 50:11, 50:15, 51:2, 60:8, 60:10, 60:17, 61:8, 61:12, 61:19, 61:21, 61:23, 63:25, 65:1, 68:2, 68:5, 68:6, 68:15
**path** [1] - 66:10
**Patrice** [6] - 1:17, 1:23, 5:10, 70:2, 70:11, 70:12
**pause** [1] - 5:6
**PCT** [1] - 60:22
**pending** [1] - 37:20
**people** [1] - 11:13
**per** [6] - 18:11, 23:8, 23:10, 27:24, 27:25, 28:2
**percent** [4] - 13:5, 24:21, 25:11, 58:11
**percolator** [1] - 46:16
**perfect** [1] - 4:25
**period** [1] - 24:1
**perpendicular** [1] - 53:21

**Perrine** [1] - 2:6
**person** [2] - 4:1, 4:2
**persuaded** [1] - 56:12
**Pharma** [1] - 39:13
**pharmaceutical** [1] - 48:16
**Phillips** [2] - 66:19, 66:20
**photograph** [4] - 15:3, 31:25, 32:8, 32:17
**pick** [9] - 9:16, 10:4, 22:22, 23:1, 23:7, 25:15, 26:5, 27:7
**picked** [2] - 16:8, 22:10
**picking** [1] - 22:9
**picture** [8] - 9:10, 13:7, 14:16, 14:18, 19:3, 19:13, 32:14, 57:10
**piece** [9] - 7:4, 7:6, 18:22, 33:20, 52:21, 58:4, 58:5, 64:14
**pieces** [3] - 6:12, 25:5, 49:5
**pink** [5] - 45:7, 45:8, 47:6, 54:18, 67:15
**piston** [18] - 31:20, 32:20, 32:24, 33:10, 33:19, 33:21, 34:24, 34:25, 35:2, 52:23, 53:17, 53:25, 54:1, 54:4, 54:12, 54:13
**pistons** [1] - 32:20
**pit** [1] - 19:19
**pitched** [1] - 16:2
**pivot** [2] - 33:17, 52:24
**pivoted** [1] - 14:5
**pivots** [3] - 33:17, 33:18, 33:19
**place** [4] - 29:25, 49:18, 70:3, 70:5
**placement** [1] - 32:7
**plaintiff** [1] - 3:9
**Plaintiff/Counter** [1] - 1:5
**plan** [1] - 37:4
**plant** [1] - 27:4
**planted** [2] - 9:20, 9:21
**plants** [1] - 10:5
**plates** [1] - 14:9
**platform** [1] - 22:22
**played** [8] - 5:20, 6:11, 7:11, 7:15, 7:20, 10:24, 20:25, 21:23
**plays** [2] - 26:11, 26:12
**PLC** [3] - 2:6, 2:10, 2:12
**pleadings** [5] - 3:6, 35:21, 36:23, 52:17, 54:9, 58:14, 61:6, 62:6, 63:12
**PLEADINGS** [1] - 1:12
**plop** [1] - 25:22
**PO** [2] - 1:24, 70:13
**pods** [1] - 25:25
**point** [21] - 7:25, 9:5, 12:16, 14:14, 21:16, 24:4, 31:9, 31:10, 37:23, 39:12, 47:16, 51:14, 56:4, 56:22, 64:1, 64:8, 64:11, 65:16, 65:19, 65:21,

67:8
**points** [3] - 5:7, 55:19
**pop** [1] - 10:6
**port** [1] - 64:3
**portable** [2] - 13:23, 14:6
**portion** [16] - 3:10, 31:16, 32:2, 32:3, 33:1, 33:13, 52:21, 53:4, 54:22, 55:10, 55:12, 56:17, 64:19, 64:22, 67:19, 67:25
**portions** [2] - 52:9, 66:1
**posit** [1] - 56:18
**position** [17] - 11:5, 11:12, 11:13, 11:14, 11:17, 12:3, 15:8, 29:10, 45:16, 45:24, 45:25, 52:22, 55:17, 55:24, 66:11, 67:1
**positioned** [2] - 16:6, 29:19
**possible** [2] - 63:14, 69:9
**possibly** [3] - 62:24, 63:3, 63:15
**pot** [2] - 46:16
**potential** [2] - 26:2, 26:21
**pounds** [8] - 23:11, 27:14, 27:18, 27:21, 27:24, 27:25, 28:2, 28:19
**PowerPoint** [1] - 58:9
**preamble** [6] - 47:22, 47:23, 47:24, 48:1, 48:5, 64:21
**preceding** [2] - 43:1, 43:7
**predating** [1] - 14:6
**preferred** [3] - 42:18, 42:23, 64:24
**premature** [2] - 62:5, 62:19
**present** [14] - 4:13, 40:22, 41:5, 41:8, 41:18, 42:2, 43:5, 43:10, 48:8, 50:21, 54:4, 63:21, 63:23, 64:1
**presentation** [1] - 58:25
**presented** [3] - 34:10, 59:16, 69:1
**presenting** [1] - 4:6
**pretty** [4] - 25:22, 28:17, 60:7
**prevents** [1] - 26:22
**previous** [2] - 6:6
**primarily** [1] - 41:12
**primary** [1] - 9:1
**priority** [3] - 60:11, 68:6, 68:11
**problem** [4] - 24:22, 36:9, 50:6, 59:16, 59:17, 64:23, 69:1, 69:2
**Procedure** [3] - 38:15, 43:18, 43:25
**proceed** [1] - 53:5
**proceeded** [1] - 49:22
**proceeding** [3] - 38:18, 38:25, 55:22
**Proceedings** [1] - 69:12
**proceedings** [3] - 3:1, 70:4,

70:5
**proceeds** [1] - 30:19
**process** [7] - 49:9, 62:9, 62:22, 63:1, 63:19, 66:15, 66:16
**product** [3] - 13:19, 29:7, 30:1
**products** [12] - 8:16, 11:4, 18:10, 30:21, 33:6, 33:8, 34:6, 34:11, 39:23, 40:17, 56:8
**properly** [1] - 14:14
**property** [1] - 65:7
**propose** [1] - 37:16
**prosecution** [8] - 49:10, 50:24, 51:7, 58:6, 58:10, 58:18, 61:10, 66:21
**provide** [3] - 40:1, 44:5, 50:25
**provides** [2] - 24:25, 47:14
**providing** [1] - 46:25
**provisions** [1] - 43:22
**proximity** [1] - 18:3
**public** [17] - 8:15, 38:1, 38:3, 38:6, 38:8, 38:9, 44:6, 50:25, 51:2, 51:7, 53:10, 55:5, 56:2, 56:3, 59:21, 65:6, 66:1
**pull** [5] - 5:13, 10:5, 20:4, 33:22, 58:9
**pulled** [3] - 23:18, 66:18
**pulling** [2] - 23:2, 64:23
**pulls** [1] - 32:24
**purely** [1] - 22:7
**purpose** [2] - 65:2, 65:5
**purposes** [2] - 23:5, 44:3
**pushed** [1] - 32:19
**pushes** [1] - 32:21
**pushing** [1] - 29:1
**put** [18] - 5:3, 9:6, 14:16, 20:23, 31:9, 41:16, 42:10, 43:17, 44:10, 44:14, 49:16, 49:25, 54:19, 55:1, 58:2, 59:20, 60:1, 65:5

**Q**

**questions** [4] - 7:23, 34:13, 56:21, 65:14
**quick** [1] - 58:9
**quickly** [4] - 5:22, 26:4, 57:5, 68:21
**quit** [1] - 36:20
**quite** [1] - 27:2

**R**

**rain** [1] - 26:20
**raise** [2] - 12:16, 39:3
**raised** [2] - 61:5, 67:9
**rake** [1] - 6:8
**ran** [1] - 34:12

**RAO** [1] - 2:4
**RAPIDS** [1] - 1:2
**Rapids** [4] - 1:16, 1:24, 2:6, 70:13
**rather** [3] - 14:17, 20:21, 63:10
**read** [4] - 42:2, 47:18, 66:6, 66:21
**ready** [1] - 4:19
**real** [2] - 58:9, 61:24
**really** [7] - 5:21, 55:2, 57:16, 59:22, 62:19, 64:5, 64:6
**rear** [3] - 18:1, 19:20, 20:1
**reason** [3] - 11:22, 13:3, 32:14
**reasons** [2] - 39:4, 52:7
**rebuttals** [1] - 63:1
**received** [1] - 15:6
**receiving** [1] - 15:11
**recitations** [1] - 47:22
**recites** [1] - 19:8
**record** [5] - 51:7, 63:11, 63:13, 66:22, 70:5
**red** [2] - 17:16, 32:4
**reduce** [2] - 27:18, 68:8
**reduced** [1] - 16:15
**reduces** [1] - 22:15
**redundant** [1] - 10:23
**refer** [4] - 11:11, 11:14, 45:18, 60:8
**reference** [18] - 40:10, 40:23, 41:22, 42:8, 43:15, 43:16, 44:9, 45:21, 48:9, 50:11, 50:14, 50:23, 59:19, 60:6, 60:22, 60:24, 61:19, 68:14
**referenced** [3] - 45:21, 68:2, 68:16
**references** [2] - 58:7, 59:15
**referencing** [1] - 50:14
**referred** [4] - 11:19, 12:23, 19:11, 66:22
**referring** [1] - 41:8
**regard** [20] - 9:18, 10:18, 11:19, 12:7, 13:15, 14:23, 16:5, 16:13, 16:22, 18:9, 22:11, 23:10, 24:4, 25:10, 25:24, 26:13, 27:23, 28:7, 31:7, 31:14
**regarding** [1] - 51:23
**regularly** [1] - 37:19
**Regulations** [2] - 43:21, 48:20
**regulations** [2] - 24:11, 43:24
**reiterate** [1] - 48:7
**reiterating** [1] - 50:17
**reject** [1] - 43:20
**rejection** [1] - 59:2
**rejections** [3] - 48:24, 49:1, 49:11
**relate** [1] - 41:1

**related** [6] - 24:19, 41:13, 61:12, 63:24, 68:6, 70:6
**relates** [1] - 41:18
**relative** [1] - 70:7
**relayed** [1] - 42:7
**relevant** [2] - 8:14, 8:15
**relied** [1] - 40:25
**relies** [3] - 17:23, 44:21, 47:13
**rely** [5] - 40:23, 41:12, 45:17, 51:10, 58:17
**relying** [1] - 44:23, 46:6, 56:3
**remainder** [1] - 19:4
**remarks** [2] - 8:19, 40:15, 68:23
**remotely** [2] - 6:22, 59:4
**removed** [2] - 14:16, 52:20
**removes** [1] - 10:11
**repeat** [1] - 51:15
**reply** [1] - 57:9
**reported** [2] - 1:17, 70:3
**REPORTER** [5] - 5:11, 5:17, 8:7, 38:19, 42:19
**Reporter** [4] - 1:18, 1:23, 70:2, 70:12
**reports** [1] - 62:24
**repose** [9] - 20:9, 20:12, 20:14, 20:16, 20:18, 21:10, 21:16, 36:2, 36:6
**representation** [1] - 39:7
**representations** [5] - 39:8, 40:19, 51:8, 51:10, 67:4
**representing** [1] - 3:12
**reprisal** [1] - 53:19
**require** [2] - 39:20, 54:17
**required** [4] - 48:12, 56:16, 56:18, 56:19
**requirements** [1] - 40:11
**resolved** [2] - 37:15, 63:18
**respect** [2] - 43:13, 54:2
**respond** [2] - 35:17, 35:22, 43:23
**responded** [2] - 49:25, 50:4
**response** [5] - 49:21, 58:23, 59:8, 65:18, 68:20
**retained** [1] - 25:2
**retract** [1] - 33:21
**retracts** [1] - 32:24
**reverse** [1] - 11:7
**review** [1] - 48:18
**revise** [1] - 49:16
**rid** [1] - 27:17
**rig** [1] - 27:19
**right-hand** [4] - 13:7, 18:16, 31:21, 32:4
**ripe** [3] - 39:8, 54:17, 56:14
**RMR** [1] - 1:23, 70:12
**road** [2] - 36:4, 36:9
**roadways** [1] - 11:25
**roll** [2] - 21:14, 54:13
**roller** [1] - 31:22, 32:16,

**rollers** [1] - 32:18
**rolls** [4] - 21:14, 31:22, 32:23, 32:25
**rotary** [1] - 10:8
**rotate** [1] - 54:14
**rotated** [1] - 31:4
**rotating** [1] - 10:8
**roughly** [3] - 10:1, 10:18, 23:13
**row** [6] - 9:19, 9:22, 9:25, 10:4, 22:24
**Rowe** [2] - 47:16, 48:4
**Rowe's** [1] - 48:4
**rows** [4] - 10:2, 10:3, 22:25, 23:1
**Rule** [11] - 37:9, 37:12, 37:17, 37:18, 37:20, 37:22, 38:14, 38:22, 39:24, 39:25, 56:11
**rule** [7] - 23:13, 24:12, 27:13, 28:3, 37:18, 39:16, 58:15
**rules** [4] - 27:9, 48:22, 48:23, 62:9
**ruling** [1] - 69:8
**run** [1] - 17:19
**running** [2] - 22:13, 22:19

**S**

**S.E** [2] - 1:16, 2:6
**safe** [1] - 12:3
**safely** [2] - 12:1, 13:4
**Sagent** [1] - 39:13
**satisfied** [1] - 55:7
**satisfy** [2] - 40:11, 52:22
**saw** [7] - 11:4, 20:22, 46:13, 51:17, 53:19, 55:1, 64:1
**scheme** [1] - 8:14
**scope** [7] - 37:12, 40:4, 40:18, 42:11, 43:11, 48:3, 49:20, 51:8, 52:2, 53:6, 56:6, 56:10, 58:20, 65:22, 66:25, 67:7
**search** [1] - 48:23
**Sease** [2] - 2:10, 2:11
**season** [3] - 24:23, 25:15, 26:17
**second** [4] - 3:5, 35:2, 38:12, 54:16
**section** [24] - 19:4, 19:5, 19:20, 22:6, 31:17, 32:2, 32:11, 32:13, 33:2, 40:25, 45:7, 45:9, 45:20, 47:6, 47:23, 52:11, 54:10, 54:18, 54:20, 55:9, 67:16
**secure** [2] - 38:17, 38:24
**see** [48] - 6:1, 6:14, 7:12,

**7:17, 8:23, 10:22, 11:10, 14:18, 16:11, 16:12, 20:20, 20:23, 21:3, 21:6, 21:9, 21:24, 23:14, 31:15, 31:23, 38:4, 41:16, 42:1, 43:25, 44:8, 44:16, 44:18, 45:8, 45:15, 45:22, 46:4, 46:5, 46:13, 47:7, 50:4, 50:8, 52:16, 54:8, 54:11, 55:3, 55:13, 55:16, 55:18, 58:23, 60:25, 61:24, 64:13, 66:17
**seeing** [2] - 32:10, 54:23
**seeking** [2] - 40:18, 55:20
**self** [2] - 51:16, 56:6
**self-limit** [1] - 51:16
**self-limiting** [1] - 56:6
**semi** [3] - 23:22, 24:13
**semitrailer** [5] - 19:9, 19:10, 50:8, 59:18, 69:3
**semitruck** [1] - 9:13
**sense** [4] - 4:11, 4:19, 16:18, 59:9
**separate** [5] - 51:22, 52:4, 54:1, 55:12, 56:13
**separates** [1] - 57:19
**series** [3] - 51:15, 60:10, 68:11
**service** [1] - 26:14
**set** [1] - 70:9
**Seventh** [1] - 1:15
**several** [1] - 57:17
**shake** [5] - 21:19, 36:1, 36:4, 36:12, 36:15
**shakes** [1] - 36:14
**shaking** [2] - 60:12, 61:9
**shared** [1] - 66:15
**Shawn** [1] - 3:11
**SHAWN** [1] - 3:11
**shelf** [3] - 19:24, 31:21
**shell** [1] - 10:12
**shelled** [3] - 13:16, 13:24, 14:15
**shoot** [1] - 7:17
**shooting** [2] - 6:7, 6:15
**short** [3] - 11:21, 13:17, 30:1
**Shorthand** [2] - 1:17, 70:2
**shorthand** [3] - 1:18, 44:2, 70:4
**shovel** [1] - 13:1
**show** [11] - 9:10, 11:7, 19:3, 23:14, 27:2, 45:25, 47:5, 55:4, 55:22, 59:14, 61:1
**showed** [4] - 53:15, 54:19, 67:2
**showing** [5] - 10:25, 20:21, 32:2, 32:5, 48:11
**shown** [10] - 15:3, 15:7, 15:22, 18:20, 19:2, 32:13, 50:10, 58:24, 67:21, 68:1
**shows** [9] - 10:22, 19:3, 21:13, 28:24, 32:8, 32:15,

45:24, 59:13, 67:13
  **Siaw** [1] - 4:1
  **sic** [2] - 9:21, 62:11
  **side** [9] - 12:13, 12:22, 13:22, 15:23, 17:13, 18:16, 31:21, 32:5, 53:22
  **sides** [1] - 16:2
  **sidewall** [2] - 12:22, 28:10
  **sidewalls** [4] - 13:9, 16:11, 16:12, 17:23
  **sign** [1] - 65:8
  **significance** [4] - 11:17, 17:22, 24:14, 24:25
  **significant** [6] - 18:9, 18:13, 19:15, 23:25, 31:13, 34:9
  **similar** [4] - 15:3, 29:8, 42:15, 43:6
  **similarly** [1] - 20:1
  **Simmons** [1] - 2:6
  **simple** [4] - 20:10, 25:22, 49:6, 57:4
  **simply** [2] - 44:11, 55:22
  **sin** [1] - 60:3
  **single** [60] - 15:18, 15:19, 15:22, 16:13, 16:16, 17:3, 23:1, 28:23, 29:6, 29:18, 30:2, 30:3, 30:4, 34:4, 40:8, 40:20, 40:22, 41:1, 41:6, 41:7, 41:10, 41:13, 42:6, 43:4, 44:23, 45:23, 46:7, 48:11, 50:3, 50:9, 50:15, 50:16, 50:18, 51:17, 51:20, 56:7, 57:23, 57:25, 58:3, 59:18, 59:19, 59:22, 59:24, 60:21, 61:20, 63:24, 64:20, 64:24, 65:9, 65:12, 67:6, 67:8, 67:10, 67:17, 68:1, 69:3, 69:5
  **single-column** [1] - 50:3
  **single/dual** [1] - 67:12
  **singular** [3] - 42:12, 43:3, 43:10
  **singularly** [1] - 41:8
  **sit** [3] - 4:22, 6:25, 7:1
  **sits** [1] - 21:15
  **sitting** [2] - 22:9, 62:20
  **six** [2] - 40:24, 41:21
  **size** [1] - 17:21
  **skip** [1] - 62:3
  **slats** [1] - 13:2
  **slide** [17] - 9:6, 9:10, 12:12, 12:13, 13:13, 13:21, 15:16, 17:12, 17:13, 18:16, 19:23, 20:6, 28:20, 28:21, 30:11, 31:24, 33:4
  **slider** [1] - 19:16
  **slight** [1] - 35:11
  **slightly** [1] - 33:22
  **slope** [2] - 16:14, 17:22
  **sloping** [1] - 16:12
  **slow** [1] - 38:19
  **slows** [1] - 26:22

  **small** [1] - 9:3
  **smaller** [4] - 16:17, 16:18, 23:6, 23:8
  **smallest** [1] - 33:7
  **snap** [1] - 12:20
  **so-called** [1] - 47:18
  **soil** [3] - 27:1, 27:3, 27:7
  **solution** [1] - 35:25
  **solved** [1] - 36:17
  **someone** [1] - 49:7
  **sometimes** [2] - 49:10, 60:25
  **somewhat** [1] - 8:9
  **son** [1] - 8:21
  **soon** [1] - 69:8
  **sorry** [5] - 34:12, 34:19, 38:19, 42:19, 45:13
  **soybeans** [2] - 25:24, 27:25
  **space** [1] - 19:24
  **spacing** [1] - 9:25
  **sparse** [1] - 41:11
  **speaking** [5] - 16:16, 17:7, 17:18, 43:14, 59:8
  **specific** [6] - 8:20, 41:21, 59:16, 67:6, 67:8, 69:1
  **specifically** [10] - 38:4, 39:21, 41:2, 42:22, 43:25, 45:9, 46:10, 46:19, 54:1, 55:4
  **specification** [19] - 39:18, 40:6, 40:9, 40:21, 42:10, 48:18, 58:7, 59:23, 60:1, 60:16, 60:23, 61:10, 61:17, 61:23, 65:11, 66:4, 66:23, 67:11, 67:22
  **specifications** [1] - 42:15
  **specified** [1] - 40:24
  **specify** [3] - 43:8, 52:19, 53:13
  **speed** [1] - 23:19
  **speedy** [2] - 38:17, 38:24
  **splits** [1] - 24:24
  **splitting** [1] - 25:2
  **spoil** [1] - 26:4
  **spot** [1] - 20:22
  **spout** [21] - 6:2, 6:3, 6:14, 6:16, 6:20, 7:2, 7:7, 7:8, 7:14, 7:17, 15:8, 15:10, 21:4, 30:23, 32:9, 35:6, 35:12, 35:14, 57:21, 59:5, 64:10
  **spread** [1] - 36:3
  **spreads** [1] - 36:16
  **squishing** [1] - 27:1
  **stage** [4] - 37:10, 37:12, 38:13, 39:9
  **stalk** [5] - 25:17, 25:20, 25:21, 25:22
  **stalks** [1] - 25:7
  **stall** [1] - 22:2
  **standard** [2] - 9:23, 58:10
  **standardized** [4] - 27:22, 27:24, 27:25, 28:1
  **standing** [1] - 25:14

  **standpoint** [1] - 22:7
  **start** [3] - 5:19, 25:2, 28:20
  **started** [1] - 7:2
  **starts** [3] - 21:18, 29:2, 41:18
  **State** [2] - 26:14, 70:2
  **statements** [1] - 59:11
  **STATES** [1] - 1:1
  **states** [4] - 38:15, 38:22, 42:1, 43:25
  **statutory** [2] - 48:22, 48:23
  **steel** [1] - 27:17
  **step** [1] - 7:13
  **still** [6] - 13:12, 17:22, 21:17, 22:9, 38:6, 63:7
  **stipulate** [1] - 62:16
  **stop** [5] - 5:21, 11:2, 21:8, 22:13, 22:15
  **storage** [8] - 10:17, 14:3, 14:25, 20:15, 23:3, 23:23, 24:17, 25:11
  **store** [1] - 46:12
  **stored** [1] - 13:4
  **straight** [5] - 6:7, 6:15, 17:10, 30:7, 33:24
  **straighten** [1] - 17:9
  **Street** [2] - 2:4, 2:6
  **strikethrough** [1] - 49:13
  **structural** [3] - 47:21, 48:5, 51:23
  **structurally** [1] - 52:7
  **structure** [9] - 44:24, 45:1, 46:1, 46:24, 47:1, 47:14, 47:15, 47:25, 51:16
  **stuck** [1] - 20:6
  **studies** [1] - 27:2
  **study** [1] - 26:15
  **stuff** [1] - 64:5
  **style** [18] - 40:8, 40:13, 40:20, 41:2, 41:13, 42:7, 44:23, 45:23, 46:7, 48:11, 50:16, 50:18, 50:22, 51:17, 51:20, 51:21, 56:7, 68:1
  **substantial** [1] - 28:7
  **sufficient** [2] - 39:18, 48:21
  **sufficiently** [1] - 45:11
  **suggests** [1] - 47:21
  **suit** [1] - 52:16
  **Suite** [4] - 2:3, 2:6, 2:10, 2:12
  **summarizing** [1] - 42:1
  **summary** [4] - 41:1, 42:3, 56:4, 68:16
  **sump** [5] - 16:4, 16:7, 16:23, 28:24, 28:25, 29:3, 29:10, 30:6
  **support** [3] - 53:8, 54:3, 65:3
  **supported** [3] - 51:24, 54:21, 67:18
  **supporting** [3] - 45:11, 46:2, 50:1
  **supposed** [1] - 61:1
  **Supreme** [1] -

  **surface** [1] - 21:20
  **surrendered** [1] - 58:20
  **Susman** [2] - 2:3, 3:12
  **switch** [4] - 34:1, 37:4, 37:5, 64:12
  **system** [2] - 10:14, 25:3

## T

  **table** [1] - 5:1
  **tailor** [1] - 8:18
  **talk** [16] - 8:11, 12:12, 15:17, 18:17, 19:7, 24:20, 28:22, 39:10, 40:14, 41:22, 45:3, 51:2, 60:5, 66:20, 67:10
  **talked** [2] - 4:13, 52:7
  **talking** [16] - 5:6, 9:16, 10:19, 23:11, 23:25, 24:6, 26:10, 26:11, 27:9, 27:11, 28:4, 28:13, 30:23, 30:24, 34:5, 59:4
  **talks** [4] - 38:3, 38:5, 52:11, 54:20
  **tapered** [1] - 19:18
  **tapering** [1] - 19:25
  **target** [3] - 7:19, 20:23, 20:24
  **teach** [1] - 61:1
  **teaches** [1] - 59:7
  **teaching** [1] - 44:25
  **tech** [1] - 4:1
  **technical** [3] - 11:21, 19:11, 62:21
  **technology** [7] - 5:2, 7:22, 12:14, 13:6, 44:6, 44:8, 45:4, 50:7, 51:18, 51:19, 64:2
  **tell** [4] - 26:13, 26:24, 28:15, 35:24
  **ten** [1] - 61:8
  **term** [8] - 19:11, 20:8, 27:14, 39:15, 39:17, 53:2, 53:3, 55:25
  **terms** [8] - 9:1, 30:14, 51:3, 53:10, 55:21, 56:1, 62:23, 63:7
  **Texas** [2] - 2:3, 2:5
  **text** [1] - 44:1
  **THE** [41] - 1:1, 1:1, 1:11, 1:12, 1:13, 3:2, 3:15, 3:18, 3:21, 4:3, 4:9, 4:19, 4:24, 5:9, 5:13, 6:17, 6:19, 6:22, 6:25, 7:10, 7:24, 8:2, 8:21, 34:15, 34:21, 34:25, 35:4, 35:7, 35:15, 35:23, 36:12, 36:15, 36:20, 36:22, 37:2, 37:6, 56:22, 57:2, 65:16, 68:18, 69:6
  **themselves** [1] - 3:8
  **theory** [1] - 60:7
  **therefore** [1] - 61:22

therein [2] - 44:12, 66:5
they've [4] - 40:5, 42:5, 60:6, 67:21
thinks [1] - 53:3
Third [1] - 2:6
Thomas [1] - 3:17
THOMAS [1] - 2:6
three [4] - 43:8, 45:19, 62:22, 63:17
throughout [2] - 40:6, 61:12
thumb [4] - 23:13, 24:12, 27:13, 28:3
tidbit [1] - 9:24
tight [1] - 27:6
tilt [1] - 21:5
timing [1] - 23:24
tip [2] - 30:23, 31:17
today [3] - 3:4, 9:1, 69:10
together [4] - 5:4, 20:23, 48:10, 49:6
tons [1] - 59:9
took [2] - 40:5, 47:6
top [16] - 19:5, 19:9, 19:10, 19:23, 21:12, 21:20, 21:25, 31:18, 32:10, 34:16, 34:22, 35:3, 35:4, 35:5, 55:10, 64:18
toss [1] - 12:20
totally [2] - 64:25, 65:4
touched [2] - 12:8, 12:11
toward [2] - 19:19, 20:1
towards [1] - 32:23
town [1] - 3:17
track [11] - 3:8, 32:15, 32:24, 32:25, 49:16, 52:23, 53:17, 54:1, 54:11, 54:12, 54:14
tractor [7] - 7:1, 7:4, 13:12, 23:18, 24:13, 27:13, 27:19
tractor-drawn [1] - 13:12
tradeoffs [1] - 22:6
traditional [1] - 31:10
trailer [17] - 9:14, 18:8, 18:15, 20:14, 21:3, 24:2, 27:11, 27:12, 27:13, 27:19, 27:20, 28:8, 28:18, 31:7, 31:8, 31:9, 31:11
trailers [5] - 19:11, 19:12, 24:13, 28:7, 28:14
transcribed [1] - 70:4
Transcript [2] - 1:21, 1:21
transcript [1] - 70:5
transfer [10] - 18:5, 18:23, 18:24, 19:1, 30:17, 31:1, 31:14, 32:5, 33:15, 55:14
transferred [2] - 19:1, 19:9
transport [6] - 11:16, 11:22, 12:3, 15:8, 18:2, 28:15
Transportation [4] - 12:6, 24:10, 24:11, 27:9
transported [2] - 9:13, 11:24
transports [1] - 30:15
trapped [1] - 17:1

trespassing [1] - 65:8
trouble [2] - 8:5, 63:25
truck [17] - 5:24, 6:15, 11:1, 15:10, 18:14, 20:3, 21:10, 21:18, 22:14, 27:19, 35:25, 36:1, 36:3, 36:5, 36:13, 36:15, 60:12
trucks [3] - 6:6, 19:7, 19:25
true [2] - 67:11, 70:5
try [5] - 25:13, 25:14, 27:5, 57:3, 68:10
trying [4] - 20:22, 26:6, 35:25, 58:4
turn [1] - 35:11
turning [2] - 27:8, 28:25
TUTORIAL [1] - 1:11
tutorial [13] - 3:5, 4:6, 4:11, 4:13, 4:16, 5:2, 7:22, 8:11, 31:24, 35:17, 35:18, 50:7, 51:19
tutorials [4] - 45:4, 51:18, 62:21, 64:2
two [13] - 19:15, 24:8, 25:2, 26:23, 29:18, 33:1, 43:12, 49:5, 50:3, 52:8, 56:4, 61:20, 64:8
two-column [1] - 50:3
type [7] - 40:12, 41:20, 44:22, 46:11, 47:13, 48:7, 56:8
types [2] - 65:24, 65:25

## U

U.S [1] - 27:22
uncommon [1] - 58:16
under [4] - 48:21, 56:11, 64:25, 69:9
underlined [1] - 50:9
underlining [1] - 49:14
underneath [1] - 19:15
understood [1] - 66:25
undertook [1] - 52:2
undisputed [3] - 57:18, 57:22
unencumbered [1] - 34:8
unit [3] - 18:11, 23:7, 48:15
UNITED [1] - 1:1
units [6] - 9:20, 10:4, 22:24, 48:15, 48:17
University [1] - 26:14
unladened [4] - 27:14, 27:15, 27:16, 27:21
unless [1] - 58:19
unload [2] - 22:16, 23:24, 24:2
unloaded [3] - 9:13, 27:15, 27:21
unloading [3] - 19:16, 20:3, 41:19

unmistakable [1] - 58:21
unnecessary [1] - 53:9
unrelated [2] - 60:7, 65:1
untech [1] - 4:2
up [48] - 5:24, 6:8, 6:9, 9:6, 9:7, 10:14, 11:7, 13:9, 14:1, 14:3, 14:12, 14:17, 14:23, 15:1, 15:9, 15:14, 16:8, 18:3, 18:7, 20:11, 21:6, 22:21, 24:1, 30:19, 32:9, 32:25, 35:6, 35:10, 35:14, 36:10, 41:16, 42:10, 43:17, 47:23, 52:8, 54:14, 54:19, 54:25, 55:1, 58:9, 60:6, 62:17, 63:10, 63:16, 64:16, 68:3, 68:22
upper [6] - 9:10, 9:15, 32:12, 54:10, 55:9, 56:17
upward [1] - 16:9
upwardly [2] - 29:3, 29:12, 67:24
use [20] - 8:4, 26:22, 27:15, 27:17, 37:4, 40:13, 41:3, 41:5, 42:19, 43:5, 44:4, 44:25, 45:14, 46:11, 48:5, 55:19, 55:25, 61:2, 67:21
used [17] - 8:25, 9:3, 9:16, 13:16, 14:10, 16:16, 42:15, 42:16, 42:22, 42:25, 43:16, 48:25, 52:20, 52:23, 54:4, 55:25, 66:8
useful [1] - 44:3
uses [2] - 16:3, 57:23
using [6] - 1:18, 17:1, 23:8, 23:17, 31:3, 31:23
USPTO [1] - 39:8
utilized [3] - 40:21, 43:18, 68:7

## V

vacuum [2] - 66:8, 66:9
variation [1] - 49:5
variations [1] - 42:24
variety [1] - 48:22
various [2] - 9:21, 11:11
vehicle [1] - 14:24
verbatim [1] - 44:10
Verizon [3] - 43:1, 43:6, 43:8
versus [3] - 3:3, 39:13, 66:19
vertical [1] - 11:20
vessel [2] - 14:25, 15:10
vibrate [1] - 36:1
vibration [1] - 21:18
video [17] - 5:4, 5:20, 6:11, 7:11, 7:15, 7:20, 10:21, 10:24, 20:19, 20:21, 20:23, 20:25, 21:13, 21:21, 21:23, 22:1, 23:14
videos [1] - 20:20
view [11] - 5:7, 7:3, 15:23,

17:15, 19:13, 19:22, 54:11, 55:16, 57:13, 66:21
views [1] - 54:8
virtue [1] - 20:10
voice [1] - 5:5
volume [1] - 23:2
voluntarily [1] - 52:2
Voorhees [2] - 2:10, 2:11
VS [1] - 1:6

## W

wagon [8] - 9:12, 13:15, 13:18, 13:19, 14:17, 29:4, 41:19
wagons [2] - 9:2, 13:23
wait [2] - 25:16, 25:24
walking [1] - 12:18
walks [1] - 67:14
wall [3] - 19:18, 19:19, 19:25
walls [5] - 15:25, 16:1, 16:14, 16:15, 19:17
want [24] - 5:22, 16:22, 17:2, 17:3, 24:2, 35:16, 35:18, 37:8, 43:15, 49:15, 51:14, 55:1, 56:4, 57:5, 59:19, 60:5, 60:17, 64:4, 65:18, 65:21, 66:9, 68:3, 68:19, 68:20
wanted [1] - 55:23
wants [1] - 58:1
ways [2] - 11:11, 65:25
weather [3] - 24:19, 26:14
week [1] - 66:17
weight [7] - 24:13, 27:18, 27:24, 27:25, 28:1, 28:4, 28:17
weights [1] - 27:23
welcome [1] - 4:9
whatsoever [1] - 8:22
wheat [2] - 24:15, 28:1
wheels [1] - 13:9
whereas [2] - 6:6, 7:18
wherein [4] - 47:2, 47:3, 47:7, 47:24
WHEREOF [1] - 70:9
whole [2] - 20:21, 64:6
wide [1] - 28:9
width [6] - 9:22, 10:1, 11:25, 12:4, 12:5, 27:11
widths [1] - 9:21
Williams [1] - 70:3
WILLIAMS [1] - 1:13
Williamsburg [1] - 2:14
window [2] - 26:5, 26:7
windows [1] - 27:6
WITNESS [1] - 70:9
Wolle [1] - 3:17
WOLLE [1] - 2:6
wolle [1] - 3:18
wood [1] - 13:2

**word** [6] - 26:8, 26:9, 55:19, 57:7, 57:9
**words** [5] - 49:15, 57:25, 58:21, 67:12, 68:8
**work** [2] - 17:3, 38:11
**working** [1] - 22:2
**works** [7] - 10:22, 23:15, 32:21, 43:17, 46:1, 46:6
**worry** [1] - 36:6
**wrap** [1] - 52:8
**written** [3] - 61:4, 61:16, 65:2

## X

**X2Y** [1] - 44:16

## Y

**year** [1] - 27:5
**years** [4] - 14:21, 15:1, 27:5
**yellow** [1] - 52:10
**yield** [5] - 25:6, 25:16, 26:7, 26:10, 27:5

## Z

**zoom** [2] - 45:7, 45:13
**zooming** [1] - 45:13